ESTATE OF OSCAR L. MATHIS, DECEASED, JOSIE L. MATHIS, ADMINIS-
TRATRIX, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 2036-64—2038-64.   Filed December 5, 1966.

*Thomas C. Mapother*, for the petitioners.
*Dennis M. Feeley*, for the respondent.

HOYT, *Judge:* Respondent determined deficiencies in petitioners'
income taxes and additions to the tax under section 6651 of the In-
ternal Revenue Code of 1954 as follows:

| Docket No. | Petitioners | Year | Deficiency | Addition to the tax |
|---|---|---|---|---|
| 2036-64 | Estate of Oscar L. Mathis, deceased, Josie L. Mathis, administratrix | 1960 | $8,194.87 | $2,048.72 |
| 2037-64 | Estate of Oscar L. Mathis, deceased, Josie L. Mathis, administratrix, and Josie L. Mathis, surviving wife | 1960 | 320.00 | None |
| 2038-64 | Josie L. Mathis | 1961 | 332.80 | 83.20 |
| | | 1962 | 42.80 | 2.14 |

These cases were consolidated upon motions by the petitioners and
will be decided together.   The questions presented are whether the
petitioners received dividend income on certain shares of preferred
stock of the Krispy Kreme Doughnut Corp., and if so, whether the
failure of the petitioners to file Federal income tax returns reporting
such distributions was due to reasonable cause and not to willful
neglect.

FINDINGS OF FACT

The facts have been fully stipulated.   The stipulation of facts and
exhibits referred to therein are incorporated herein by this reference.

Oscar L. Mathis, hereinafter referred to as the decedent, died
intestate on February 22, 1960, while a resident of Kentucky.   Josie
L. Mathis, widow of the decedent, was appointed administratrix of
the decedent's estate.   Josie L. Mathis filed a joint individual income
tax return for 1960 for herself and her deceased husband with the
district director of internal revenue at Louisville, Ky.   No income
tax return by or on behalf of the Estate of Oscar L. Mathis, deceased,

---

[1] Proceedings of the following petitioners are consolidated herewith: Estate of Oscar L.
Mathis, Deceased, Josie L. Mathis, Administratrix, and Josie L. Mathis, Surviving Wife,
docket No. 2037-64; and Josie L. Mathis, docket No. 2038-64.

was filed for 1960. Josie L. Mathis did not file income tax returns for 1961 and 1962.

The Krispy Kreme Doughnut Corp., hereinafter referred to as Krispy Kreme, a North Carolina corporation with principal offices at Winston-Salem, had two issues of stock prior to and during October 1960, neither of which was listed on any major stock exchange. One issue consisted of 16,314 shares of class A common, and the other consisted of 2,088 shares of 6-percent cumulative preferred with a par value of $100 per share.

The decedent's estate included 380 shares of preferred stock and 1,880 shares of common stock of Krispy Kreme. The decedent's stock ownership constituted 18.20 percent of the preferred stock and 11.52 percent of the common stock. The decedent acquired 250 shares of Krispy Kreme preferred stock on June 10, 1947, and 130 shares of the preferred stock on November 20, 1948. Prior to January 1, 1960, Krispy Kreme had never formally declared, or actually paid, a dividend on the preferred stock. Krispy Kreme did not formally declare a dividend on the preferred stock while the decedent or his estate was an owner.

The decedent owed Krispy Kreme $51,555.61 with accrued interest at the time of his death. This debt was represented by a note dated July 23, 1959, issued in the face amount of $64,000. The principal amount had been reduced by seven installment payments. As security for this note, decedent had pledged and delivered 940 shares of common stock and 380 shares of preferred stock of Krispy Kreme.

The decedent's estate had insufficient funds to pay the Krispy Kreme debt which was in default. Therefore, the administratrix of the estate entered into negotiations with Krispy Kreme to work out an arrangement, satisfactory to both parties, under which the debt could be discharged. On October 21, 1960, an agreement was ultimately executed. It provided in pertinent part as follows:

WHEREAS, Krispy Kreme has made certain proposals dated April 12, 1960, and April 13, 1960, to Administratrix concerning transactions in respect to the disposal of 1880 shares of Class "A" common stock of Krispy Kreme, and payment of certain debts of the estate, and said Krispy Kreme has been advised by its counsel that neither Krispy Kreme nor the Administratrix can fully comply with said proposals nor bind all persons interested, and

WHEREAS, it is necessary for Krispy Kreme to demand payment on a certain note, face amount of $64,000.00, dated July 23, 1959, given by the late Oscar L. Mathis to Krispy Kreme, and

WHEREAS, the said Administratrix, Guardian, Mrs. Mathis and Mary Lee are unable to pay the balance of $51,555.61 and accrued interest due on said note, and

WHEREAS, some 940 shares of Class "A" common stock and 380 shares of preferred stock of Krispy Kreme belonging to the late Oscar L. Mathis was pledged by him as collateral for the payment of said note, and

WHEREAS, decedent owned a total of 1880 shares of common stock of Krispy Kreme (including 940 shares pledged as set out above) and Krispy Kreme is

willing to purchase all but not a part only, of said 1880 shares as a means of payment of the balance due on said note,

Now, THEREFORE, for and in consideration of these premises, the sum of $1,500.00 paid by Krispy Kreme to Administratrix, the receipt of which is hereby acknowledged; and other valuable considerations, the parties hereto agree as follows:

1. Subject to the provisions of this contract first parties hereby:

(a) agree to sell, as a means of paying the remaining indebtedness due to second party upon a note of Oscar L. Mathis, deceased, for $64,000.00, dated July 23, 1959, all, but not a part only, of 1880 shares of Class "A" common stock of Krispy Kreme outstanding in said decedent's name; and

(b) agree to accept $59.50 per share therefor, for a total consideration of $111,860.00 for said 1880 shares, payment to be made as set forth below; and

(c) agree that second party may deduct $49,860.00 from the said proceeds to be applied on the balance of the principal and interest of said decedent's note amounting to $52,346.14 remaining due and owing as of August 1, 1960, leaving a balance still due on said note of $2,486.14 as of August 1, 1960; and

(d) agree to pay said balance of the note of $2,486.14 at the time of final execution hereof; and

(e) agree to accept 620 shares of $100.00 per share par value preferred stock of Krispy Kreme fully paid and nonassessable, which together with the credit of $49,860.00 as aforesaid, shall constitute payment in full of said $111,860.00.

2. Subject to the provisions of this contract Krispy Kreme hereby:

(a) agrees to purchase, as a means of collecting the remaining indebtedness due it upon the Oscar L. Mathis note of $64,000.00, dated July 23, 1959, all, but not a part only, of the 1880 shares of Class "A" common stock of Krispy Kreme outstanding in said shareholder's name; and

(b) agrees to pay $59.50 per share therefor, for a total consideration of $111,-860.00 for said 1880 shares, payment to be made as set forth below; and

(c) agrees, as part payment of said $111,860.00, to credit the sum of $49,860.00 on the balance of principal and interest amounting to $52,346.14 remaining due and owing on said note as of August 1, 1960, leaving after said credit a balance of $2,486.14 still owing on said note as of August 1, 1960; and

(d) upon receipt of said sum of $2,486.14,

(1) agrees to deliver to administratrix the certificates (#19 through 23) representing 380 shares of preferred stock, pledged as collateral security for said note, free and clear of said pledge; and

(2) agrees to deliver 620 shares of $100.00 per share per [sic] value preferred stock of Krispy Kreme, fully paid and nonassessable, which, together with the credit of $49,860.00 as aforesaid, shall constitute payment in full of said $111,-860.00; and

(3) agrees to deliver the original note and pledge agreement of July 23, 1959, with appropriate entries thereon indicating it to be paid and satisfied in full.

(e) agrees to take such steps as may be necessary to validate this contract under North Carolina law, and covenants that the execution of this contract and the obligation hereunder assumed by Krispy Kreme to purchase said total of 1000 shares of preferred stock on or before September 30, 1961, has been duly authorized by a vote of the majority of the holders of voting stock of Krispy Kreme and that proper notice of said purchase has been seasonably mailed to all preferred shareholders of Krispy Kreme.

(f) agrees as a part of the overall method of collecting the aforesaid indebtedness due by Oscar L. Mathis, deceased, to purchase from said Administratrix on or before September 30, 1961, or in any event not later than May 1, 1962, a total

of 1000 shares of preferred stock of Krispy Kreme together with all accrued dividends thereon at said date of its purchase, represented by certificates #19 through #23, and the 620 shares of said preferred stock issued by Krispy Kreme in accordance with this contract, for a total consideration of $132,630.00, plus additional $500.00 per month for each month after September 30, 1961, and up to May 1, 1962, payable in each month in which said purchase is not completed.

(g) agrees to pay said last consideration as follows:

(a) $26,130.00 in cash upon final execution of this contract in two checks as follows:

(i) $2,486.14 check made payable to Administratrix and Krispy Kreme, which check is attached to this contract, and is to be endorsed to Krispy Kreme by Administratrix at her execution hereof and which is to be applied by Krispy Kreme in final payment of the balance due on said note as of July 23, 1960; and

(ii) $23,643.86 payable to Administratrix.

(b) $500.00 per month to Administratrix for 13 months starting on or about September 1, 1960, and thereafter on or about the 1st day of each succeeding month; and

(c) $100,000.00 in cash on or before September 30, 1961, or on the date thereafter said purchase is completed but in no event later than May 1, 1962, payable to Administratrix.

3. Subject to the provisions of this contract, parties of the first part hereby:

(a) agree to sell Krispy Kreme the said 1880 shares of Krispy Kreme Class "A" common stock for a total consideration of $111,860.00 to be paid as set out in 1. and 2. above; and

(b) agree to pay, or cause to be paid to Krispy Kreme the sum of $2,486.14 representing the balance due on said note of July 23, 1960, after the sale and purchase of said Class "A" common has been consummated; and

(c) agree to sell to Krispy Kreme on or before September 30, 1961, or on any date thereafter at the option of Krispy Kreme, but in no event later than May 1, 1962, the said 1000 shares of preferred stock of Krispy Kreme, together with all dividends thereon to date of sale for a total consideration calculated and payable as set out in 2. above, and not to exceed $136,130.00; and

(d) agree to execute an appropriate escrow agreement whereby said 1000 shares of preferred stock shall be deposited, endorsed in blank, with the First National Bank of Winston-Salem, Forsyth County, North Carolina, to be delivered to Krispy Kreme after it has paid for said preferred stock in accordance with this contract; and

\*　·　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(g) agree that any sale or transfer of said 1880 shares of Class "A" common stock or of said 1000 shares of preferred stock by said Administratrix in conformity with this contract shall serve to convey to Krispy Kreme all of Administratrix's, Guardian's, Mrs. Mathis' and Mary Lee's rights, title, and interest of whatever nature or description, and whether now in existence or which might hereafter come into existence.

5. All parties hereto agree that:

\*　　　　\*　　　　\*　·　　　\*　　　　\*　　　　\*　　　　\*

(e) This contract shall bind all parties hereto, jointly and severally unless the context indicates otherwise, and their respective heirs, successors, assigns, and personal representatives; and

Pursuant to the terms of the contract between the administratrix and the company, she sold 1880 shares of Krispy Kreme common stock

to the corporation accepting in payment therefor 620 shares of preferred stock and a credit of $49,860 against decedent's debt to Krispy Kreme. The balance of $2,486.14 due on decedent's debt to Krispy Kreme was to be paid by the estate out of the cash payment hereinafter mentioned due under the contract. Krispy Kreme in turn agreed to purchase the estate's total of 1,000 shares of preferred stock for $132,630. This total consideration was to be paid as follows: $26,130 in cash upon the signing of the contract, $6,500 in monthly installments of $500 each for 13 months, and a final payment of $100,000 due on or before September 30, 1961. At Krispy Kreme's option, final payment could be delayed until May 1, 1962, but in this event Krispy Kreme would be required to pay an additional consideration of $500 per month during the extended period.

Krispy Kreme paid the administratrix the sum of $26,130 in October of 1960 upon the signing of the contract which was dated October 21, 1960; the administratrix delivered 1880 shares of common stock to Krispy Kreme and Krispy Kreme in turn delivered 1,000 shares of preferred stock to the administratrix. In addition Krispy Kreme made monthly payments of $500 each to the administratrix which totaled $2,000, $6,000, and $2,000 for the years 1960, 1961, and 1962, respectively. The administratrix delivered 1,000 shares of Krispy Kreme preferred stock to the First National Bank of Winston-Salem in accordance with an escrow agreement made on October 24, 1960, pursuant to the terms of the contract above specified. On May 1, 1962, Krispy Kreme paid the sum of $100,000 to the escrow agent and upon receipt thereof the escrow agent paid said sum over to the administratrix and delivered the 1,000 shares of Krispy Kreme preferred stock to Krispy Kreme.

The articles of incorporation of Krispy Kreme provide that no dividends are to be paid to holders of its common stock until all accrued dividends owed the preferred stockholders have been paid. Krispy Kreme's corporate charter provides that upon dissolution of the corporation, the preferred stock shall be repaid its par value, together with all accumulated and unpaid dividends, before any amount is paid on the common stock; and, after such payment, the preferred stock shall not further share in the assets of the corporation. The preferred shares of stock in Krispy Kreme had no voting rights.

During the years 1960, 1961, and 1962, respectively, Josie L. Mathis, as administratrix, distributed to herself as an heir a portion of the monthly payments made by Krispy Kreme under the settlement contract in the amounts of $2,050, $3,000, and $1,000.

Decedent's estate reported and paid estate taxes on the value of its shares in Krispy Kreme, which value was reported as follows: 380 shares preferred, $70,630; 1,800 shares common, $111,860.

No Federal fiduciary income tax return was filed on behalf of the decedent's estate for 1960, 1961, or 1962.

The decedent was the uncle of Vernon Rudolph, president of Krispy Kreme, and of two other employees of Krispy Kreme. Josie L. Mathis had no blood relationship with anyone connected with Krispy Kreme. The decedent, his wife, and their children had no other close relationship to any of Krispy Kreme's stockholders.

The respondent assessed deficiencies based on his determination that the decedent's estate received dividend income as a result of the distributions made by Krispy Kreme with respect to the preferred stock owned by decedent's estate during 1960, 1961, and 1962, and as provided for in the contractual agreement relating to the purchase of the stock by Krispy Kreme. Total dividends were determined to be $36,130, and this was the total amount received by the administratrix on the preferred stock prior to the final payment of $100,000. The deficiency notice adjustments increased the estate's taxable income for 1960 by dividends in the amount of $28,130. For the same year the joint income tax liability of the Estate of Oscar L. Mathis, deceased, and Josie L. Mathis was increased by adding dividend income of $2,000 to the taxable income disclosed by the joint return filed. In the explanation of adjustment contained in the respondent's determination it was stated that the amount of $2,050 received by Josie Mathis in 1960 as distributions from the Estate of Oscar L. Mathis, deceased, constitutes taxable income. After deduction of the dividend exclusion in the amount of $50, additional income of $2,000 was added to the income disclosed by the return filed.

For the years 1961 and 1962 it was determined that Josie L. Mathis received dividend income in the respective amounts of $3,000 and $1,000, such amounts being dividend income distributed from the Estate of Oscar L. Mathis, deceased, in those years. Decedent's estate was allowed a deduction in the deficiency computation for 1960 for distributions made to beneficiaries.

### ULTIMATE FINDINGS OF FACT

All of the payments made by Krispy Kreme pursuant to its agreement dated October 21, 1960, were part of and steps in an integrated plan to effect a complete redemption of the preferred stock in question; they were all distributions in part or full payment in exchange for the stock redeemed which resulted in a complete termination of the petitioners' interest in the corporation.

### OPINION

Respondent contends that the decedent's estate received accumulated and current dividends on Krispy Kreme preferred stock in the amount

of $36,130. Section 316 [2] provides that the term "dividend" means any distribution of property made by a corporation to its shareholders out of its earnings and profits. Dividends are included in gross income under section 61(a)(7).

Petitioners contend that the $36,130 in issue here constituted installment payments made under the purchase contract relating to Krispy Kreme stock owned by the decedent's estate. If these payments qualify under section 302(a) as distributions in redemption [3] of all of the Krispy Kreme preferred stock owned by the decedent's estate, the distributions will be considered as part or full payment in exchange for the stock.[4] In such a case, therefore, the transaction would be accorded capital gains treatment rather than dividend treatment.

Respondent concedes that the purchase of the 1,000 shares of preferred stock by Krispy Kreme on May 1, 1962, qualifies as a redemption within the provisions of section 302(a), and that the gain realized is taxable at capital gains rates. However, respondent maintains that the purchase price of the preferred stock was $100,000, the amount paid on May 1, 1962. He argues that all amounts received under the terms of the contractual agreement between Krispy Kreme and the decedent's estate from the time of its execution until May 1, 1962, were dividends and therefore not part of the overall purchase price of the preferred stock.

Respondent contends that the contractual agreement fixed the price of the preferred stock at $100,000 plus the amount of accrued dividends owed at the date of redemption. He concludes that since no dividends were owed on May 1, 1962, only $100,000 was paid and this amount represented the true purchase price. Respondent places reliance on certain factors to bolster his argument.

The decedent's estate reported the value of the 380 shares of preferred stock owned at the date of death as $70,630, or approximately $185 per share. This valuation was the estimated fair market value of the stock as of the date of death. See sec. 2031. Petitioners state that this value was determined by subtracting $62,000, the contract price placed upon the 620 preferred shares issued for the redeemed common, from the minimum redemption price for all 1,000 shares of

---

[2] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[3] A redemption occurs if a corporation acquires its stock from a shareholder in exchange for property. Sec. 317(b).

[4] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

\* \* \* \* \* \* \*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

preferred which was $132,630. It is petitioner's position that the 1,000 shares were redeemed for $136,130, or $136.13 per share.

Respondent explains the differing values by stating that the fair market value of preferred stock depends largely on the amount of the accrued dividends. Thus it is argued that the value of the preferred shares might have been $185 per share at the date of death because of accrued dividends, but the fair market value would drop to $100 per share if all the dividends were paid.

It is respondent's view that the parties to the contractual agreement recognized that the price to be paid for the preferred shares when they were finally redeemed would depend on the amount of accrued dividends. Respondent concludes from his analysis that dividends in arrears on the 380 shares of preferred stock owned by decedent at his death were paid upon execution of the purchase agreement. He then argues that Krispy Kreme thereafter made monthly dividend payments on all 1,000 shares and held an option to purchase the preferred stock for $100,000 any time after October 21, 1960, but not later than May 1, 1962.

The evidence of record has convinced us that $36,130 of the $136,130 received under the preferred stock redemption agreement actually was measured by an allowance for accrued and unpaid dividends, although no formal declaration of dividends had ever occurred. However, this does not mean that the $36,130 should be treated as ordinary dividend income. On the contrary, accrued dividends on preferred stock paid in connection with a stock redemption are properly treated as part of the payment in exchange for the stock. See G.C.M. 5180, VII-2 C.B. 110. The decisive question, therefore, is whether the $36,130 here involved should be considered to have been paid in part payment for the preferred stock in connection with a stock redemption.

While conceding that the sale of the preferred shares was in complete redemption, respondent contends that the initial and installment payments were dividends and the final payment was the true redemption price. The problem with his argument is that it fails to distinguish an obligation arising under a purchase contract from an intangible right to dividends which have never been declared. At the time the redemption contract was executed, Kripsy Kreme had no obligation to pay dividends which had theoretically accrued on the preferred stock. While it is true that owners of the preferred stock would be entitled to accrued dividends before dividends could be paid on the common stock or before distributions could be made to common shareholders upon dissolution of the corporation, this does not support the existence of a presently enforceable right to receive accrued dividends in a certain dollar amount on the date the purchase contract was executed. Therefore, we see no reason to segregate the

receipt of $36,130 from the redemption of the preferred shares based upon the foregoing reasoning of respondent.

Respondent's final argument for treatment of the $36,130 as ordinary dividend income focuses upon the terms of the purchase agreement. It is contended that the sale of the preferred stock did not occur until May 1, 1962, with the payment of $100,000, since the agreement was only an agreement to purchase which did not pass title to the stock. Relying on *Warren National Bank, Executor*, 22 B.T.A. 759 (1931), affd. 61 F. 2d 325 (C.A. 3, 1932), respondent maintains that under the agreement, Krispy Kreme had the choice of tendering the $100,000 to the escrow agent and purchasing the stock, or not tendering the $100,000, in which case no sale would occur and the escrow agent would return the stock to the decedent's estate. It is further maintained that the payments of $36,130 were made prior to the passage of title and could not be returned regardless of whether Krispy Kreme later purchased the stock. Payments on the preferred stock should therefore have constituted dividends when made and this characterization should not change whether or not Krispy Kreme later purchased the stock. *Merrill C. Gilmore*, 25 T.C. 1321 (1956).

Respondent emphasizes the lack of penalties if either party had refused to honor the purchase agreement for the preferred stock. There was no need for penalties, according to respondent, since neither party would lose because of nonperformance. The decedent's estate would still own the stock and Krispy Kreme would have had to pay the accrued dividends someday.

We find respondent's interpretation of the purchase agreement unrealistic. He would have us construe it as essentially an option to purchase exercisable no later than May 1, 1962, at a price of $100,000, and a reciprocal option to sell at that price. This theory ignores the express terms of the purchase agreement. Krispy Kreme was specifically obligated to purchase all 1,000 shares of preferred stock, with the final payment being due no later than May 1, 1962. The decedent's estate placed the stock in escrow with the understanding that the ultimate transfer would occur upon Krispy Kreme's compliance with the terms of the argeement, and final performance was to occur no later than May 1, 1962.

The fact that title to the preferred stock did not pass upon execution of the purchase agreement does not preclude the existence of a binding redemption contract. Respondent's reliance upon the *Warren National Bank* case, is misplaced. There, the question was whether the initial payment on a sales contract was taxable in the year made, or in the year the contract became binding. The existence of a sales contract was found to be contingent upon the buyer gaining approval of a public service commission. It was held that there was no pay-

ment on the sale until the contingency was removed during the following year.

The purchase agreement in this case contained no contingencies and was thus absolutely binding on both buyer and seller. The absence of penalty provisions would not eliminate a cause of action for breach of contract upon nonperformance by either party. The decedent's estate could not have kept the payments made under the agreement and refused to convey the stock when the final payment was tendered.

It is our opinion that the $36,130 received under the purchase agreement prior to May 1, 1962, was received in connection with a redemption which qualifies under section 302(b)(3) as a complete termination of a shareholder's interest. Viewing the entire transaction as a whole, it seems that the only distinction between this redemption and the normal redemption of stock which qualifies under section 302(b)(3) is the presence of installment payments. The statute contains no prohibition against payment of the redemption price on an installment basis. At the time the purchase agreement was executed, both parties became bound to effectuate a complete redemption of all the preferred stock owned by the decedent's estate by a certain date and for a maximum price.

A complete termination of the shareholder's interest in the Krispy Kreme stock did occur in accordance with the purchase agreement. We are not persuaded that petitioners should be denied the favorable tax treatment provided by section 302(b)(3) for installment payments received under a binding redemption contract. Although the purchase agreement was more complicated than necessary to accomplish the goal of redeeming all the Krispy Kreme stock held by the decedent's estate at the date of death, such purpose was clearly the bona fide intent of the parties.

After considering all the pertinent facts and not being conclusively bound by the form in which parties to an agreement clothe their arrangement, we have made a determination of the realities of the transaction. See *Carl L. Danielson*, 44 T.C. 549 (1965). We hold, therefore, that the $36,130 did not constitute dividend income because it was received in connection with a redemption qualifying under section 302(b)(3), and it constituted part of the price paid for the 1,000 shares of preferred stock. We are not willing to fragmentize this transaction as respondent would have us do. Petitioners' evidence is convincing that the redemption has been piloted to the safe harbor provided by sections 302(a) and 302(b)(3).

Our holding with respect to the preceding issue eliminates the necessity to determine whether petitioners' failure to report the payments received on the preferred stock prior to May 1, 1962, as dividend

income was due to reasonable cause and not to willful neglect as provided by the delinquency penalty provisions of section 6651.

Petitioners have conceded upon brief that their basis for computing gain on transfer of the 1,000 shares of preferred stock was $132,630 and this minimum redemption price was also utilized in the estate tax return. Therefore, petitioners recognize that a long-term capital gains tax is owed on the difference between this basis and the total amount received for the shares, $136,130, the difference constituting a gain of $3,500. The gain would be taxable to the decedent's estate in the year received, 1962, but this year is not before us with respect to the estate. However, petitioner Josie L. Mathis is taxable under section 691 for the amount of the gain distributed to her in 1962, and her tax deficiency for 1962 is before us. The deficiencies will be determined accordingly, but no additions to tax under section 6651(a) will be found, respondent having apparently conceded same on brief in docket No. 2038–64 if no dividend distributions were found as to petitioner therein, Josie L. Mathis, for 1962. To reflect all necessary adjustments—

*Decisions will be entered under Rule 50.*