120 T.C. No. 3

UNITED STATES TAX COURT

MERRILL LYNCH & CO., INC. & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18170-98.               Filed January 15, 2003.

MP is the parent of an affiliated group (P) that
filed consolidated income tax returns for the taxable
years at issue.

<u>1986 Transactions</u>: In 1986, P decided to sell the
principal investments business of MLL, a second tier
subsidiary.  Because P wanted to retain certain assets
of MLL, consisting of its lease advisory business and
certain other assets (the 1986 retained assets) within
the consolidated group while minimizing or eliminating
gain on the sale of MLL outside the consolidated group,
P adopted and implemented a plan consisting of the
following steps: (1) MLL distributed the 1986 retained
assets to its subsidiary, Merlease; (2) MLL then sold
Merlease cross-chain to a sister corporation (MLAM) in
a transaction that qualified as a sec. 304, I.R.C.,
deemed redemption; (3) MLL then distributed a dividend
of the gross sale proceeds to its parent, MLCR, a
wholly owned subsidiary of MP; (4) P then completed the
sale of MLL to a third party.  Under the consolidated

return regulations then in effect, the cross-chain sale and the related dividend generated an increase in MLCR's basis in MLL's stock, enabling P to sell MLL outside the consolidated group at a loss.

On the date of the 1986 cross-chain sale, P had identified the prospective purchaser of MLL, had negotiated a tentative purchase price for MLL, and clearly intended to sell MLL outside the consolidated group, thereby terminating MLL's constructive ownership under sec. 318, I.R.C., of Merlease, the issuing corporation.

On its consolidated tax return for TYE Dec. 26, 1986, P claimed a loss from the sale of MLL after treating the gross sale proceeds as a dividend and increasing its basis in MLL's stock by that amount.

1987 Transactions: P decided to sell the leased properties business of MLCR, its wholly owned subsidiary. Because P wanted to retain MLCR's nonleasing assets (the 1987 retained assets) while minimizing or eliminating gain on the sale of MLCR outside the consolidated group, P adopted and implemented a plan consisting of the following steps: (1) MLCR identified the subsidiaries holding the 1987 retained assets (MLBFS, MLPC, MLVC, MLEI, MLRDM, MLI, MLLE); (2) MLCR then sold the seven subsidiaries to three sister corporations (MLRI, MLPFS, MLAM) within the consolidated group in transactions that qualified as sec. 304, I.R.C., deemed redemptions; (3) MLCR then distributed dividends of the gross sales proceeds to its parent, MLCMH, a wholly owned subsidiary of MP; (4) P then completed the sale of MLCR to a third party. Under the consolidated return regulations then in effect, the cross-chain sales and related dividends generated increases in MLCMH's basis in MLCR's stock, enabling P to sell MLCR outside the consolidated group at a loss.

On the dates of the first seven of the 1987 cross-chain sales, P had identified the purchaser of MLCR, had prepared a draft acquisition agreement, and clearly intended to sell MLCR outside the consolidated group, thereby terminating MLCR's constructive ownership under sec. 318, I.R.C., of the subsidiaries sold cross-chain (the issuing corporations).

After the first seven of the 1987 cross-chain sales had closed and shortly before the sale of MLCR was scheduled to close, the purchaser of MLCR notified P that it could not own VL, one of MLCR's subsidiaries because of Federal law restrictions. Approximately 2 weeks before the sale of MLCR closed, MLCR sold the stock of VL to MLAM, a sister corporation, in a transaction that qualified as a deemed sec. 304, I.R.C., redemption.

On its consolidated income tax return for TYE Dec. 26, 1987, P claimed a loss of $466,985,176 from the sale of MLCR after treating the gross sales proceeds from the 1987 cross-chain sales as a dividend and increasing its basis in MLCR's stock by that amount.

Respondent determined that the nine cross-chain sales of Merlease, MLBFS, MLPC, MLVC, MLEI, MLRDM, MLI, MLLE, and VL (the subsidiaries) and the sales of MLL and MLCR outside the consolidated group were parts of a firm, fixed, and clearly integrated plan to completely terminate MLL's and MLCR's actual and constructive ownership of the subsidiaries. Petitioner contends that each cross-chain sale resulted in the receipt of a dividend by the selling corporation under secs. 302(d) and 301, I.R.C., equal to the gross sale proceeds and that it was entitled, under the consolidated return regulations, to increase its basis in MLL's and MLCR's stock as a result of the cross-chain sales.

Held: The cross-chain sales qualified as redemptions in complete termination of MLL's and MLCR's interest in the subsidiaries sold cross-chain under sec. 302(b)(3), I.R.C., and must be taxed as distributions in exchange for stock under sec. 302(a), I.R.C., rather than as dividends under sec. 301, I.R.C.

David J. Curtin, Sheri Dillon, Peter J. Genz, William F. Nelson, Kimberly S. Piar and Cornelia J. Schnyder, for petitioner.

Carmen M. Baerga, Jill A. Frisch, Lyle B. Press, and Jody S. Rubinstein, for respondent.

MARVEL, Judge:  Respondent determined the following deficiencies in the Federal income tax of Merrill Lynch & Co., Inc. (Merrill Parent) and subsidiaries (collectively, the consolidated group or petitioner):

| TYE | Deficiency |
| --- | --- |
| Dec. 26, 1986 | $7,704,908 |
| Dec. 25, 1987 | 12,141,242 |
| Dec. 30, 1988 | 12,928,981 |

The ultimate issue in this case involves the proper computation of petitioner's basis in the stock of two consolidated group members (the target corporations) that it sold in 1986 and 1987.  In order to resolve that issue, we must decide the tax effect of nine cross-chain sales[1] of stock of certain subsidiaries (the issuing corporations) owned by the target corporations.  These sales were structured by petitioner to transfer certain assets from the target corporations to other members of the consolidated group (the acquiring corporations)

---

[1]For purposes of this opinion, a cross-chain sale means a sale by one brother-sister corporation to another brother-sister corporation in the same ownership chain.

before the target corporations were sold outside the consolidated group. The parties agree that the cross-chain sales qualified as section 304[2] redemptions that must be tested for dividend equivalency under section 302(b). The parties disagree, however, regarding the result of that testing.

Respondent contends that each cross-chain sale by a target corporation and the later sale of that target corporation outside the consolidated group were parts of a firm, fixed, and clearly integrated plan to completely terminate the target corporation's actual and constructive ownership of the issuing corporations. Respondent argues, therefore, that the cross-chain sales qualified as redemptions in complete termination of the target corporations' interest in the issuing corporations under section 302(b)(3), and must be taxed as a distribution in exchange for stock under section 302(a). Petitioner contends that each cross-chain sale resulted in the receipt of a dividend by the selling corporation under sections 302(d) and 301 equal to the gross sale proceeds and that it was entitled, under the consolidated return regulations, to increase its basis in the target corporations' stock by the amount of the dividend.[3] Petitioner's claim to

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

[3]Under the consolidated return investment adjustment
(continued...)

increased bases in the stock of the target corporations when the target corporations are sold to unrelated third-party purchasers in 1986 and 1987 depends for its success upon dividend treatment for the gross proceeds of the nine cross-chain sales. See secs. 1.1502-32(a) and 1.1502-33, Income Tax Regs.

Following concessions,[4] therefore, we must decide:

---

[3](...continued) regulations, see secs. 1.1502-32(a) and 1.1502-33, Income Tax Regs. as in effect for the years at issue, a consolidated group member's basis in a subsidiary was increased or decreased, dollar for dollar, by changes in the earnings and profits of the subsidiary. The Commissioner subsequently amended the consolidated return investment adjustment regulations generally for determinations and tax years beginning on or after Jan. 1, 1995. T.D. 8560, 1994-2 C.B. 200.

[4]In its petition, petitioner asserted (1) that respondent failed to use the Becker "separate return limitation year" net operating loss of $85,164,319 in computing petitioner's group taxable income for the 1987 taxable year; (2) respondent failed to take into account the recalculated amount of environmental tax deductions for the 1987 and 1988 taxable years; (3) respondent failed to allow a separate fuel tax credit and instead included such credit in petitioner's general business credits for the 1986 taxable year; (4) respondent failed to include petitioner's available general business tax credits in determining petitioner's alternative minimum tax for the 1988 taxable year; and (5) respondent failed to take into account $98,505 of Federal income tax withheld by Newmont Mining on dividends paid to a Canadian subsidiary of petitioner during the 1987 taxable year. In its petition, petitioner also stated that respondent agreed with petitioner's position regarding adjustments (1)-(4). In the answer to the petition, respondent conceded adjustments (1), (2), and (4). Respondent also conceded that the disagreements regarding adjustments (1)-(4) would be resolved in computing any final deficiencies in this case. With respect to adjustment (5), respondent denied the adjustment in the answer but did not raise the issue on brief or at trial. Adjustment (5) is, therefore, deemed conceded. See Rule 151(e)(4) and (5); Petzoldt v.

(continued...)

(1) Whether a deemed section 304 redemption in the form of a 1986 cross-chain stock sale between brother-sister corporations in a consolidated group must be integrated with the later sale of the cross-chain seller outside the consolidated group and treated as a redemption in complete termination under section 302(a) and (b)(3) as respondent contends, or whether the deemed section 304 redemption qualified as a distribution of property taxable as a dividend under section 301 as petitioner contends; and

(2) whether deemed section 304 redemptions in the form of eight 1987 cross-chain stock sales between brother-sister corporations in a consolidated group must be integrated with the later sale of the cross-chain seller outside the consolidated group and treated as a redemption in complete termination under section 302(a) and (b)(3) as respondent contends, or whether the deemed section 304 redemptions were distributions of property taxable as dividends under section 301 as petitioner contends.

## FINDINGS OF FACT

Some of the facts have been stipulated. We incorporate the stipulated facts into our findings by this reference.

Merrill Parent is a corporation organized under Delaware law and is the parent corporation of an affiliated group of corporations that filed consolidated Federal income tax returns

---

[4](...continued)
Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987).

during the years at issue. Merrill Parent, through its subsidiaries and affiliates, provides investment, financing, insurance, leasing, and related services to clients.

I.  1986 Sale of ML Leasing

Before it was sold outside the consolidated group, Merrill Lynch Leasing, Inc. (ML Leasing or MLL), was a wholly owned subsidiary of Merrill Lynch Capital Resources, Inc. (ML Capital Resources or MLCR), which in turn was wholly owned by Merrill Parent. ML Leasing was engaged in the business of arranging leasing transactions between third parties (lease advisory business). ML Leasing also was engaged in the business of leasing its own real and tangible personal property to third parties in the capacity of lessor (principal investments business). Immediately before the years at issue, the principal investments business leases were generating substantial positive cashflow but had "turned around" for income tax purposes, meaning that if ML Leasing continued to hold the leases, the principal investments business would generate taxable income in excess of pretax cashflow. ML Leasing also owned, directly or through single-purpose subsidiary corporations, general and limited partnership interests in limited partnerships that held property subject to operating and leveraged leases.

A.  Preliminary Discussions

As early as August 22, 1985, Douglas E. Kroeger, a member of

the corporate tax department at Merrill Parent, sent an interoffice memorandum to David K. Downes, corporate controller at Merrill Parent, recommending the sale of ML Leasing's stock, after "stripping out" certain assets Merrill Parent did not wish to sell, as part of a tax strategy that could result in an increase in after-tax earnings of more than $60 million.[5]  On September 16, 1985, Mr. Downes presented this tax strategy to Jerome P. Kenny, president and chief executive officer of Merrill Lynch Capital Markets (ML Capital Markets or MLCM),[6] and Stephen L. Hammerman, Merrill Parent's general counsel, and arranged a meeting to explain more fully the proposed tax strategy.  The proposed tax strategy at that time consisted of at least two steps--the distribution of certain assets of ML Leasing that Merrill Parent wanted to retain within the consolidated group and the sale of ML Leasing to a third party following the distribution.

---

[5]The tax strategy contemplated by Mr. Kroeger was intended to increase after-tax earnings by taking advantage of a provision in the consolidated return regulations requiring the addback of accelerated depreciation over straight-line depreciation when calculating earnings and profits.  See Woods Inv. Co. v. Commissioner, 85 T.C. 274 (1985).  This tax strategy is not at issue in this case.

[6]Although it is unclear from the record, it appears that Merrill Parent retained Merrill Lynch Capital Markets (ML Capital Markets) to sell the stock of ML Leasing in 1986 and ML Capital Resources in 1987.

At some point thereafter, Merrill Parent decided it wanted to sell only the principal investments business of ML Leasing as part of its tax strategy. Merrill Parent did not want ML Leasing's lease advisory business and certain other assets that were not part of the principal investments business (collectively referred to as the 1986 retained assets) to leave the consolidated group. Merrill Parent decided to transfer the 1986 retained assets to other corporations within the consolidated group in preparation for the sale of ML Leasing, leaving only the principal investments business remaining in ML Leasing, including the operating and leveraged lease assets.

On March 26, 1986, participants at an internal meeting of petitioner discussed the possible sale of ML Leasing's stock. At the meeting, the participants discussed the estimated tax basis of ML Leasing as of the end of 1985, the approximate value of ML Leasing, whether the sale would be prohibited because of various restrictions in the lease documents, the intangible effects of the sale of ML Leasing, the possibility of tax reform being passed prior to late August 1986, the estimated after-tax economic benefit of the sale of ML Leasing, and the estimated after-tax book gain that would result from the sale of ML Leasing. At the meeting, Jeffrey Martin, a member of petitioner's Mergers & Acquisitions Group, was asked "to feel out the market on a no-name basis inquiring if there are any

interested parties for such a transaction."  Upon conclusion of the meeting, it was decided that petitioner "would await Mr. Martin's findings before any additional work takes place" regarding the sale of ML Leasing.  In approximately April 1986, petitioner decided to pursue a sale of ML Leasing and appointed Theodore D. Sands, managing director of the Investment Banking Division at Merrill Parent, to serve as the chief negotiator with respect to the sale.[7]  Mr. Sands suggested that petitioner "clean up" ML Leasing by removing any assets the company did not want to sell (i.e., the 1986 retained assets).[8]  Mr. Sands, however, did not suggest the manner in which the 1986 retained assets should be transferred from ML Leasing, and he did not suggest implementing the 1986 cross-chain sale at issue in this case.

B.  Petitioner Seeks a Purchaser

Mr. Sands was asked to develop a profile of a likely prospective purchaser for ML Leasing and a list of prospective purchasers.  Mr. Sands established three criteria for a potential purchaser of ML Leasing:  (1) A purchaser should be financially

_____

[7]On July 28, 1986, petitioner officially appointed a five-person project team to conduct the divestiture of ML Leasing, which included Mr. Sands as chief negotiator.

[8]The 1986 retained assets consisted of assets leased under operating, finance, and leveraged leases, subject to the liabilities associated with such assets, and the shares of 34 corporate subsidiaries that owned leased equipment and leased real property.  The decision as to which assets would be sold and which would be retained was made by the head of investment banking at Merrill Parent.

sophisticated to handle the lease portfolio; (2) a purchaser should be able to finance the transaction; and (3) a purchaser should have a net operating loss (NOL) carryforward and, therefore, should be indifferent to the fact that the lease portfolio was about to turn for tax purposes.

In or around April 1986, Mr. Sands contacted Inspiration Resources Corp. (Inspiration). Inspiration was a diversified natural resources company whose stock was publicly traded on the New York and Toronto stock exchanges. Inspiration was controlled by Minerals & Resources Corp., Ltd. (MINORCO), a Bermuda corporation headquartered in London, England. Mr. Sands had worked with Inspiration on other matters before 1986 and was aware that Inspiration had a significant NOL.

Petitioner provided to Inspiration a document entitled "MERRILL LYNCH LEASING INC. Proposed Sale of Equity Investment Assets" dated April 1986 (ML Leasing offering memorandum). The ML Leasing offering memorandum described the assets that would be owned by ML Leasing at the time of the sale and the pretax cashflows expected to be derived from the portfolio of leases. The ML Leasing offering memorandum described the proposed transaction as follows:

> Prior to the sale of Leasing's stock, any of Leasing's assets which are not to be sold will be dividended to MLCR. Assets remaining in Leasing will be the equity investments in real estate and equipment net leased to major corporations, tax benefits purchased under the 1981 Tax Act, unused ITC carryover, and any state net

operating losses ("NOL's") not used in the various ML&Co. 1986 unitary returns. The remaining liabilities in Leasing would consist solely of deferred taxes.

MLCR will then sell the stock of Leasing. * * *

The 1986 retained assets were not included in the description of ML Leasing's portfolio.

On June 19, 1986, Mr. Sands prepared a memorandum entitled "Status of ML Leasing Sales Effort". The memorandum reported on a telephone call Mr. Sands received from Mr. Smith, the Vice President-Finance for Inspiration. As summarized in the memorandum, Mr. Smith "expressed strong interest" in purchasing ML Leasing and reported that he had prepared a detailed analysis for consideration by Inspiration's executive committee. Although Mr. Smith had expressed reservations about the status of Inspiration's NOLs and about the lack of certainty regarding the lease residual values, Mr. Sands reported that Mr. Smith's concern regarding Inspiration's NOLs was not a serious problem and that Mr. Smith's concern regarding the residual values would be addressed in a meeting on June 23 when Mr. Smith and his staff would meet with a representative of ML Leasing to review the residuals on a lease-by-lease basis. Mr. Sands reported that, if Mr. Smith were satisfied after the June 23 meeting, Inspiration "will make a go - no go decision on buying Leasing at the $80 million asking price based on the assumption that the residual values can be confirmed by an outside appraiser."

On July 3, 1986, a written "Presentation to Inspiration Resources Corporation" prepared by ML Capital Markets was submitted to Inspiration. The presentation again described the assets proposed to be owned by ML Leasing at the time of sale of the ML Leasing stock to Inspiration and the pretax net cashflows expected to be derived from the portfolio of leases. The 1986 retained assets were not included in those assets. The presentation proposed a purchase price of $98 million and a closing date at the end of 1986.

C. The Tax Plan and the Section 304 Cross-Chain Sale

Sometime between 1985 when the possible sale of ML Leasing was first discussed and July 21, 1986, when ML Leasing contributed the 1986 retained assets to Merlease Leasing Corp. (Merlease), petitioner finalized a plan[9] to strip ML Leasing of the 1986 retained assets and to sell ML Leasing outside the consolidated group using planning techniques designed to increase petitioner's tax basis in ML Leasing and thereby eliminate gain on the sale of ML Leasing. The plan consisted of the following steps:

---

[9]It appears from the ML Leasing offering memorandum that petitioner originally intended to have MLL distribute the 1986 retained assets to MLCR as a dividend. We infer from this fact that petitioner finalized its plan to engage in sec. 304 cross-chain sales after the ML Leasing offering memorandum had been prepared.

1. ML Leasing would contribute the 1986 retained assets to Merlease, a direct wholly owned subsidiary of ML Leasing, in anticipation of ML Leasing's sale outside the consolidated group.

2. ML Leasing would then sell Merlease cross-chain to a sister corporation within the consolidated group.

3. ML Leasing would declare a dividend to ML Capital Resources of designated assets and the gross sales proceeds from the cross-chain sale of Merlease to the acquiring corporation.

4. After each of the steps outlined above had occurred, petitioner would then sell ML Leasing to a third-party purchaser.

In accordance with the plan and pursuant to a resolution dated July 21, 1986, ML Leasing contributed the 1986 retained assets to the capital of Merlease.[10]

In accordance with the plan and pursuant to resolutions adopted on July 22, 1986, the respective boards of directors of ML Leasing and Merrill Lynch Asset Management, Inc. (ML Asset Management or MLAM), a direct wholly owned subsidiary of Merrill Parent, approved the sale of the stock of Merlease to ML Asset Management for a purchase price equal to the fair market value of such stock as of July 22, 1986. Two days later, ML Leasing and ML Asset Management entered into a stock purchase agreement dated

---

[10]Some of the same assets identified in the July 21, 1986, consent to corporate action as having been contributed to Merlease's capital were included as part of a dividend declared and paid to ML Capital Resources, ML Leasing's sole shareholder as of July 18, 1986.

July 24, 1986, pursuant to which ML Asset Management agreed to purchase all of ML Leasing's Merlease stock for a purchase price of $73,320,471. The sale closed on July 24, 1986. Immediately before ML Asset Management purchased the stock of Merlease, ML Asset Management's accumulated earnings and profits exceeded the price it paid for the Merlease stock. The parties agree that the sale of Merlease to ML Asset Management was a section 304 transaction.

D. Presentation to Merrill Parent's Board of Directors

On July 28, 1986, only 4 days after the cross-chain sale of Merlease, a formal presentation was made to Merrill Parent's board of directors regarding the sale of ML Leasing.[11] The presentation included the distribution of a written summary and slides illustrating the details of the plan for the sale of ML Leasing, including key calculations. The written summary began as follows:

> We have identified a significant economic benefit, based on an opportunity in the tax law, in selling Merrill Lynch's proprietary lease business. This economic benefit can be achieved by structuring a transaction to sell the stock of our primary leasing subsidiary, Merrill Lynch Leasing. We believe that such a sale could realistically result in an after-tax financial statement gain of approximately $104 million.

The presentation laid out the various steps of the plan to

---

[11]Petitioner was unable to locate the minutes of the meeting of the board of directors on July 28, 1986, the date the presentation was made.

dispose of Merrill Lynch's proprietary lease business culminating in the sale of ML Leasing's stock.

The stated purpose of the presentation was to secure the board's approval to enter into a letter of intent with the purchaser[12] and to secure the board's authorization for:

> the Executive Committee to approve the final details of the proposed transaction in accordance with the letter of intent, subject to closing adjustments and unforseen contingencies arising from negotiating a final agreement in early October, up to a maximum reduction of $20 million.

The written summary informed the board of directors that "due to the exhaustion of tax benefits, many of * * * [ML Leasing's] leases begin to produce taxable income in 1987, with the remainder 'turning around' in 1988. Accordingly, it is an opportune time to sell our Principal Investments line of business to an appropriate purchaser." The summary also informed the board of directors that because it was not Merrill Parent's intent to withdraw from all aspects of the leasing business, Merrill Parent was removing the 1986 retained assets from ML Leasing before ML Leasing's stock was sold in two steps: (1) The 1986 retained assets had been sold to ML Asset Management for approximately $57 million; and (2) ML Leasing will declare a $115

---

[12]The presentation represented to the board of directors that "Once both parties have signed the letter of intent, the sales price will be firmly established subject only to changes in the residual value by the appraisers. Moreover, even the impact of residual value appraisals will be limited to $14 million."

million dividend to ML Capital Resources consisting of cash received from ML Asset Management, plus other cash, receivables, and certain liabilities.  After removal of the 1986 retained assets, the summary represented that Merrill Parent would then be in a position to sell the principal investments business portion of ML Leasing.

The summary unequivocally identified Inspiration as the purchaser of ML Leasing's stock, described Inspiration, and stated that "In return for the stock of ML Leasing, we will receive $126 million in cash (subject to adjustments for residual value appraisals) from the purchaser, Inspiration Resources Corporation."  The summary also explained how the sale price was determined,[13] quantified the after-tax income and the tax benefit that would result from the sale, explained the tax risks of the transaction, and recommended the creation of a $37 million tax

---

[13]The sale price was determined by calculating the present value of the cashflow stream generated by ML Leasing's assets ($42 million), discounting the pretax cashflow to reflect the value of the cashflow to Inspiration ($143 million), calculating the value of Inspiration's NOLs ($101 million), and adding to the present value of the cashflow stream a premium of $53 million (representing a split of the benefits arising from Inspiration's NOLs).  The resulting base sale price ($95 million) was then increased by the amount of cash to be left in ML Leasing (estimated to be $31 million) to arrive at a total sale price of $126 million (subject to adjustment for residual value appraisals).

reserve for the transaction.[14]  In calculating the recommended reserve, the summary stated the following:

> The first item of tax reserve concerns the sale to Merrill Lynch Asset Management of the leasing subsidiaries we wish to retain.  The IRS could maintain that the form of this transaction should be disregarded and in substance, a distribution with a reduction in tax basis should be deemed to have occurred.  The $16 million reserve amount is the $57 million I noted previously multiplied by the 28% capital gains tax rate.

Following the presentation, Merrill Parent's board of directors approved the plan, including the sale of Merrill Leasing to Inspiration.

E.  Nonbinding Letter of Intent

On July 29, 1986, 1 day after the presentation to its board of directors, Merrill Parent entered into a nonbinding letter of intent with Inspiration for the sale of the stock of ML Leasing to Inspiration.  The letter of intent provided a "period of exclusivity" during which Merrill Parent would negotiate exclusively with Inspiration to reach an agreement for the sale of ML Leasing.  Upon executing the letter of intent, the parties agreed that "if such sale agreement is not executed on or prior to August 31, 1986, neither of us intends to proceed with the transactions contemplated herein."  The letter of intent provided

---

[14]The $37 million tax reserve consisted of a $16 million reserve for the possible disallowance of the deemed dividend resulting from the cross-chain sale and a $21 million reserve for lost tax benefits if certain income projections were not realized.

that "If the conditions to reaching an agreement are satisfied, the aggregate purchase price will be $95,000,000", subject to adjustment for cash left in ML Leasing, for the value of residuals as determined by independent appraisers, and for other specified adjustments.  The letter of intent also stated:

> It is understood that this letter of intent merely constitutes a statement of our mutual intentions with respect to the proposed acquisition and does not contain all matters upon which agreement must be reached in order for the proposed acquisition to be consummated.  A binding commitment with respect to the proposed acquisition will result only from execution of definitive agreements, subject to the conditions expressed therein.

Following execution of the nonbinding letter of intent, both Inspiration and Merrill Parent hired outside appraisers to value the lease portfolio.[15]

On July 29, 1986, Merrill Parent issued a news release to its employees announcing that it had entered into a letter of intent for the sale of a portion of its leasing operations to Inspiration.  Merrill Parent announced that the sale, if consummated, would result in a realization of after-tax gain of at least $70 million and was scheduled to close at the end of

---

[15]During July and August 1986, petitioner also executed various transfers within the consolidated group to remove assets from ML Leasing before its sale to Inspiration.  By resolutions dated July 31 and Aug. 1, 1986, ML Leasing's board of directors authorized payment of a dividend to ML Capital Resources consisting of all the capital stock of five subsidiaries of ML Leasing, intercompany receivables, cash, and other assets.  These distributions are not at issue in this case.

1986, "subject to negotiation of definitive documentation and normal conditions to closing."

On August 5, 1986, Inspiration's board of directors ratified and retroactively approved the nonbinding letter of intent between Inspiration and Merrill Parent. The board of directors authorized the executive committee of the board of directors to "take any and all necessary or desirable actions in connection with the proposed acquisition of" ML Leasing.

F.  Further Negotiations Between Petitioner and Inspiration

On August 19, 1986, Inspiration wrote a letter to Mr. Sands explaining that "Several problems have arisen over the past few weeks" regarding the purchase of ML Leasing. In the letter, Inspiration advised that it was unable "to finance this transaction on a secured basis within the timeframe and terms of our agreement." Inspiration stated that it had started to review alternative means of financing, including both unsecured financing and the sale of specific leases from the ML Leasing portfolio as a means of financing the transaction and suggested that the increased cost of the unsecured financing "may justify a downward adjustment in the purchase price." In the letter, Inspiration requested that the terms of the draft stock purchase agreement be altered to accommodate alternative means of financing; i.e., by eliminating a provision in the draft stock agreement that prohibited Inspiration from selling significant

assets from ML Leasing for a period of 5 years.  In addition,
Inspiration suggested that "Merrill Lynch may have to arrange
with the lessee and the secured noteholders to waive certain
restrictions on transfer of ownership" in order to accommodate
its request.  Inspiration also pointed out that the existing
draft purchase agreement did not contain a representation from
petitioner that the cashflows as presented to Inspiration were
correct.  Inspiration advised that in order for a lender or a
purchaser to make financing decisions based on "these cash flows,
a legal due diligence review will be insufficient and it will be
essential for Merrill Lynch to represent that the cash flows [of
the leases] are accurate."  Inspiration concluded its letter by
expressing its continued interest in completing the transaction.

In order to give the parties to the letter of intent
additional time to finalize their deal, the parties on August 29,
1986, agreed to extend the term of the nonbinding letter of
intent to September 19, 1986, and negotiations and discussions
continued with Inspiration after August 29, 1986.[16]

Shortly after August 29, 1986, petitioner's appraiser and
Inspiration's appraiser completed their analysis of residual
values.  Both appraisers valued the residual values of the leases

---

[16]A Sept. 8, 1986, interoffice memorandum from Mr. Sands
stated that although Inspiration still had not secured financing
to purchase ML Leasing, Inspiration was optimistic that it would
do so.  Mr. Sands also indicated that Inspiration's financing
efforts were going very well.

in ML Leasing's portfolio higher than petitioner and Inspiration had expected. As a result, the chief financial officer for Merrill Parent instructed Mr. Sands to negotiate an increase in the purchase price from $126.6 million to $131.4 million. In accordance with those instructions, Mr. Sands attempted to negotiate an adjustment to the purchase price. Although his efforts apparently were not initially well received,[17] the parties ultimately agreed to increase the purchase price by $3 million.

In approximately August or early September 1986, petitioner provided Inspiration with a draft stock purchase agreement dated September 11, 1986.[18] On September 16, 1986, the executive committee of Inspiration's board of directors met to discuss the acquisition of ML Leasing. After discussion, the executive committee approved the September 11, 1986, stock purchase agreement substantially in the form presented. The executive committee also authorized Inspiration's management to finalize the necessary bank financing.

---

[17]Mr. Sands was asked by Inspiration's representatives to leave the meeting, and, for at least a day after the meeting, Inspiration refused to return phone calls from either Mr. Sands or petitioner's attorneys.

[18]The Aug. 19, 1986, letter from Inspiration to Mr. Sands indicates there was a previous version of the Sept. 11, 1986, draft stock purchase agreement. The record is unclear, however, as to when the first stock purchase agreement was drafted and circulated.

G.  ML Leasing Stock Purchase Agreement

Effective September 19, 1986, Merrill Parent, ML Capital Resources, ML Leasing, and Inspiration executed an agreement for the purchase and sale of the stock of ML Leasing (ML Leasing stock purchase agreement).  The ML Leasing stock purchase agreement was amended as of October 31, 1986, to reflect further negotiations on certain matters.  The purchase price was $129,445,843, payable in cash at closing, subject to certain postclosing adjustments.  Pursuant to the ML Leasing stock purchase agreement, the purchase price subsequently was adjusted based on residual value appraisals for certain leases.  The sale of ML Leasing closed on October 31, 1986.

II.  1987 Sale of ML Capital Resources

At the beginning of petitioner's TYE 1987, ML Capital Resources was a wholly owned subsidiary of Merrill Parent.[19]  ML Capital Resources was engaged in the business of arranging equipment leasing transactions between third parties and also owned various types of equipment and other tangible personal property, which it leased to third parties.  ML Capital Resources' business focused on small business leases.  It was also a partner in certain limited partnerships that held

_____

[19]By resolution dated Apr. 8, 1987, the board of directors of Merrill Parent approved the formation of a newly organized corporation, Merrill Lynch Consumer Markets Holdings, Inc. (Consumer Markets or MLCMH), and the contribution of all the capital stock of ML Capital Resources to Consumer Markets.

computers leased to IBM and had been active in other types of financing for medium-sized businesses.  ML Capital Resources also owned the stock of a number of subsidiary corporations that were engaged in the business of arranging equity and debt financing for middle- and small-sized companies.

Merrill Parent decided to sell that portion of ML Capital Resources' business consisting of the ownership of leased property.  In the aggregate, the leases were generating substantial positive cashflow but had "turned around" for income tax purposes so that if ML Capital Resources continued to hold them, the leases would generate taxable income in excess of pretax cashflow.  Because Merrill Parent did not want ML Capital Resources' nonleasing assets to leave the consolidated group, it decided that ML Capital Resources would sell to other affiliated corporations the stock of certain subsidiary corporations that were engaged in lending and financing activities or that owned other assets and businesses that were not related to its core consumer leasing operations (collectively referred to as the 1987 retained assets).[20]

A.  Petitioner Seeks a Purchaser

Merrill Parent decided to conduct the sale of ML Capital Resources utilizing a bidding process.  By February 17, 1987, a

---

[20]Senior management decided which assets to sell and which assets to retain within the consolidated group.

draft preliminary offering memorandum regarding the sale of the stock of ML Capital Resources (preliminary offering memorandum) had been prepared, as well as a list of prospective buyers and a projection of an estimated sale price for ML Capital Resources of between $70 and $80 million, on which was calculated a potential after-tax gain of between $43.5 and $88 million.  At some point between February 17, 1987, and March 1987, the preliminary offering memorandum was finalized.

If a potential purchaser was interested after reviewing the preliminary offering memorandum, Merrill Parent required that the potential purchaser sign a confidentiality letter, at which point the potential purchaser could request a confidential 3-volume detailed offering memorandum dated March 1987 regarding the specific leases in ML Capital Resources' portfolio (3-volume offering memorandum). Under the bidding procedure established by Merrill Parent and set forth in the 3-volume offering memorandum, interested purchasers were required to submit "preliminary indications of interest", including a proposed cash purchase price, by March 27, 1987.  Immediately thereafter, ML Capital Markets and ML Capital Resources would select a limited number of potential purchasers that would be given the opportunity to perform detailed due diligence.  At that time, prospective purchasers would be given proposed forms for a stock purchase agreement.  Prospective purchasers were required to submit bids

as to price and terms by April 10, 1987.  The 3-volume offering memorandum indicated that ML Capital Resources "does not intend to engage in substantial negotiations with respect to the terms of the Stock Purchase Agreement" and proposed an April 30, 1987, closing date.

On March 13, 1987, the chairman of the board of ML Capital Resources authorized a five-person team to pursue the divestiture of ML Capital Resources, four of whom had been involved in the sale of ML Leasing.  Mr. Sands again was appointed as chief negotiator.

In and around March 1987, Merrill Parent contacted various potential purchasers regarding the sale of ML Capital Resources. The ultimate purchaser, GATX Leasing Corp. (GATX), on behalf of itself and BCE Development, Inc. (BCE), a majority-owned subsidiary of Bell Canada Enterprises (collectively referred to as GATX/BCE unless otherwise indicated), apparently received the preliminary offering memorandum sometime during March 1987 because ML Capital Markets sent GATX/BCE a confidentiality agreement dated March 23, 1987.

B.  Section 304 Cross-Chain Sales

1.  Five Subsidiaries

Effective March 28 and March 30, 1987, respectively, the boards of directors of ML Capital Resources and Merrill Lynch Realty, Inc. (ML Realty or MLRI), a wholly owned subsidiary of

- 28 -

Merrill Parent, approved the sale of all the stock of five

subsidiaries wholly owned by ML Capital Resources to ML Realty:

Merrill Lynch Business Financial Services, Inc. (Financial

Services or MLBFS);[21] Merrill Lynch Private Capital, Inc.

(Private Capital or MLPC);[22] Merrill Lynch Venture Capital, Inc.

(Venture Capital or MLVC); Merrill Lynch Energy Investments, Inc.

(Energy Investments or MLEI); and Merrill Lynch R&D Management,

Inc. (MLRDM) (collectively referred to as the five subsidiaries).

ML Capital Resources and ML Realty entered into a stock

purchase agreement dated March 30, 1987, for the sale of stock of

the five subsidiaries to ML Realty. The purchase price of the

stock of the five subsidiaries was $53,972,607 (which was

allocated to each subsidiary based on their respective book

values). The sale closed on March 30, 1987. Immediately before

its purchase of the five subsidiaries, ML Realty had accumulated

earnings and profits that exceeded the purchase price. The sales

of the five subsidiaries were five of the eight cross-chain sales

[21]Before the sale of Financial Services, effective Mar. 30, 1987, ML Capital Resources contributed certain loan receivables and other assets and liabilities with a net book value of $10 million to Financial Services. These assets and liabilities were part of the 1987 retained assets and thus were not intended to be included in the assets of ML Capital Resources at the time of the sale of its stock.

[22]Private Capital had a substantial negative book net worth as of Mar. 29, 1987. Before the sale of Private Capital, effective Mar. 30, 1987, ML Capital Resources contributed $32 million in cash to the capital of Private Capital and thereby created a positive book net worth in Private Capital.

at issue for the taxable year ended December 25, 1987.  The parties agree that these sales were section 304 transactions.

## 2.  ML Interfunding

Merrill Lynch Interfunding, Inc. (ML Interfunding or MLI), was a wholly owned subsidiary of ML Capital Resources.  By resolutions dated March 27, 28, and 30, 1987, the boards of directors of ML Capital Resources and ML  Asset Management approved the sale of all the stock of ML Interfunding to ML Asset Management.[23]  ML Capital Resources and ML Asset Management entered into a stock purchase agreement dated March 30, 1987, which provided for an initial purchase price of $160 million to be paid at closing with the purchase price to be adjusted as soon as practicable by subsequent agreement of ML Asset Management and ML Capital Resources so as to equal the fair market value of the shares as of March 30, 1987.  The sale closed on March 30, 1987.[24]  Immediately before its purchase of ML Interfunding, ML

---

[23]By resolution dated Mar. 27, 1987, the board of directors of ML Interfunding declared and paid a dividend having a total value of $100 million to ML Capital Resources of certain preferred stock that it owned in Gelco Corporation (Gelco) plus the shares of certain unaffiliated corporations (portfolio stock), which it had acquired as a dividend from its wholly owned subsidiary, ML Portfolio Management, by resolution dated Mar. 26, 1987.  By resolution dated Mar. 28, 1987, ML Capital Resources contributed the portfolio stock and the Gelco shares to Merrill Lynch Property Holdings, Inc., a direct wholly owned subsidiary of ML Capital Resources.

[24]In a valuation report dated Apr. 18, 1988, Deloitte Haskins-Sells determined that the fair market value of the stock
(continued...)

Asset Management had accumulated earnings and profits that exceeded the purchase price. This is the sixth cross-chain sale at issue for the taxable year ended December 25, 1987. The parties agree that this cross-chain sale was a section 304 transaction.

### 3. Leasing Equipment

By resolutions dated April 3, 1987, the respective boards of ML Capital Resources and Merrill Lynch, Pierce, Fenner & Smith, Inc. (MLPFS), a first-tier wholly owned subsidiary of Merrill Parent, approved the sale of all the stock of ML Leasing Equipment Corp. (Leasing Equipment or MLLE), a wholly owned subsidiary of ML Capital Resources, to MLPFS.[25] ML Capital Resources and MLPFS entered into a stock purchase agreement dated April 3, 1987. The purchase price for Leasing Equipment's stock was $119,819,690. The sale closed on April 3, 1987. Immediately before its purchase of Leasing Equipment, MLPFS had accumulated

---

[24](...continued)
of ML Interfunding as of Mar. 30, 1987, was $181,080,000. Based on such appraisal, ML Asset Management and Consumer Markets, as assignee of ML Capital Resources' rights under the ML Interfunding stock purchase agreement, agreed that ML Asset Management would pay Consumer Markets $26,413,365 as the final payment of the purchase price for the ML Interfunding stock, which was the difference between $181,080,000 and the net consideration paid at closing of $154,666,635.

[25]On Apr. 2, 1987, ML Capital Resources contributed the stock of MLL Corporate Partners, Inc., a subsidiary of ML Capital Resources engaged in nonleasing activities, to Leasing Equipment.

earnings and profits that exceeded the purchase price.  This is the seventh cross-chain sale at issue for the taxable year ended December 25, 1987.  The parties agree that this cross-chain sale was a section 304 transaction.

### C.  The Sale of ML Capital Resources

Pursuant to the bidding procedure governing the sale of ML Capital Resources, petitioner received five or six bids, including one from GATX/BCE.  The bid from GATX/BCE, dated April 21, 1987, contained the principal terms upon which GATX/BCE was prepared to purchase all the outstanding shares of ML Capital Resources (April 21, 1987, bid proposal).[26]  GATX/BCE proposed a base purchase price of $63 million, plus 70 percent of certain residual payments in excess of $27 million.  GATX/BCE's April 21, 1987, bid proposal specifically provided, among other things, the following conditions precedent:  (1) GATX/BCE would enter into a purchase agreement only upon the receipt of all requisite corporate approvals, including approvals by the boards of GATX and BCE, and (2) satisfactory completion of further due diligence.  The further due diligence included, but was not limited to, review of the basic and related documentation, review of audited financials of the IBM partnerships and ML Capital

---

[26]Although the bidding procedure required each prospective purchaser to submit by Mar. 27, 1987, preliminary indications of interest outlining a proposed purchase price, the record contains no information regarding what, if anything, GATX/BCE submitted.

Resources, and review of a report prepared by IBM Credit Corporation for the partners of the IBM partnerships.

On April 23, 1987, a formal presentation regarding the sale of ML Capital Resources was made to Merrill Parent's board of directors at its regular meeting. The presentation was made by Courtney F. Jones. The substance of the presentation was summarized in a written summary and slides illustrating the details of the plan for the sale of ML Capital Resources. The written summary began as follows:

> We have identified a significant economic benefit, based on an opportunity in the tax law, in selling Merrill Lynch's proprietary middle market lease business. This economic benefit can be achieved by structuring a transaction to sell the stock of one of our leasing subsidiaries, Merrill Lynch Capital Resources. We believe that such a sale could realistically result in an after-tax financial statement gain of approximately $73 million.

> In conjunction with Merrill Lynch Capital Markets we have identified a purchaser. The purpose of this presentation is to secure your approval for the Executive Committee to approve the final details of the transaction and sign the definitive agreement.

The written summary laid out the various steps of the plan to dispose of Merrill Lynch's proprietary middle-market lease business culminating in the sale of ML Capital Resources' stock.

The written summary informed the board of directors that--

> due to the exhaustion of tax benefits, many of * * * [ML Capital Resources'] leases have begun to produce taxable income in 1987. The projected cash flow from the leases will in most years not be sufficient to service the debt and the tax liability generated by the

> leases.  Accordingly, it is an opportune time to sell this business to an appropriate purchaser.

The written summary also informed the board of directors that because Merrill Parent did not intend to withdraw from the "Lending Activities" aspect of the business, Merrill Parent "will first remove the assets and operations related to the businesses we wish to retain" and will "transfer all of the subsidiaries of ML Capital Resources elsewhere within our Corporate structure" in three steps before ML Capital Resources' stock was sold:  (1) ML Capital Resources had already sold ML Interfunding's stock to ML Asset Management for its net book value of approximately $160 million; (2) ML Capital Resources had already sold the stock of certain of its subsidiaries to ML Realty Inc. for approximately $50 million; and (3) ML Capital Resources will declare a $459 million dividend to its parent company, Merrill Lynch Consumer Markets Holdings, Inc. (Consumer Markets), consisting of cash received from ML Asset Management and ML Realty, existing cash balances, the stock of the remaining subsidiaries, receivables, and liabilities.  The board was informed that after these transfers were completed, ML Capital Resources "will have equity of approximately $40 million" and "we will be in a position to sell" ML Capital Resources' stock.

The presentation identified "a joint venture between BCE Development, Inc., a wholly owned U.S. subsidiary of Bell Canada and GATX Leasing Corporation, a wholly owned subsidiary of GATX

Corporation" as the likely purchaser and estimated a sales price

of $70 million, consisting of $62 million in cash plus the

assumption of $8 million in liabilities.  The presentation also

explained how the sale price was determined, quantified the

after-tax income and the tax benefit that would result from the

sale, explained the tax risks of the transaction, and recommended

the creation of a $35 million tax reserve for the transaction.[27]

In calculating the recommended reserve, the presentation stated

the following:

> As you can imagine, it is the tax aspects that make
> this sale especially attractive.  The Tax Department,
> in conceiving this transaction, has creatively applied
> two different tax concepts to maximize the calculation
> of Merrill Lynch's tax basis in ML Capital Resources.
>
> *       *       *       *       *
>
> The second tax concept deals with the creation of
> approximately $210 million in tax basis.  This basis is
> created by selling the stock of certain ML Capital
> Resources subsidiaries to MLAM and ML Realty Inc. for
> $210 million, rather than distributing this value to ML
> Consumer Markets Holdings Inc.  Under the tax rules the
> sale is recharacterized as two separate transactions; a
> dividend by MLAM and MLRI to MLCR of $210 million and a
> contribution to the capital of MLAM and MLRI by MLCR of
> approximately the same amount.  The dividend received
> by MLCR increases Merrill Lynch's tax basis in MLCR by
> $210 million.  MLCR's contribution to the capital of
> MLAM and MLRI has no effect on tax basis.

---

[27]The $35 million tax reserve consisted of a $14 million
reserve for the possible disallowance of the deemed dividend
resulting from the cross-chain sale and a $21 million reserve for
lost tax benefits if certain income projections were not
realized.

>The final step is for MLCR to declare a dividend of cash, certain subsidiaries, and receivables to ML Consumer Markets Holdings Inc. This intercompany dividend triggers a taxable gain that also increases our tax basis in MLCR. What remains is our tax basis at the time of sale, $340 million.

>As our basis in the stock is greater than the sales price, the sale results in a $278 million long term capital loss. This capital loss will offset other long term capital gains, resulting in a tax benefit of $94 million.

>The intercompany dividend to ML Consumer Markets Holdings triggers a tax liability of $8 million, which reduces the maximum potential tax benefit to $86 million.

The summary represented that Merrill Parent's corporate law department and outside counsel had already prepared a proposed definitive sales agreement and that the purchaser had submitted its desired contract changes, which were being negotiated. Although the summary requested the board of directors to authorize the executive committee to approve the final details of the transaction and to sign the definitive agreement for a minimum sales price of $70 million, the board authorized the proper officers to finalize the sale of all the capital stock of ML Capital Resources for not less than $60 million, subject to adjustments based on the valuation of certain assets.

D.  <u>GATX/BCE Modifies Its Initial Bid</u>

In a letter addressed to Mr. Sands dated April 27, 1987, GATX modified its April 21, 1987, bid proposal (April 27, 1987,

bid proposal).[28]  GATX reconfigured its April 21, 1987, bid proposal from $63 million, plus 70 percent of the discounted value of the residual payments in excess of $27 million, to $66 million, plus 40 percent of the discounted value of residual payments in excess of $29.5 million.  The April 27, 1987, bid proposal stated that, except for the replacement of the original paragraphs in the April 21, 1987, bid proposal concerning the purchase price, "all other terms and conditions remain unchanged."  As of April 27, 1987, GATX/BCE had not evaluated the lease portfolio of ML Capital Resources, and the proposed purchase price was based on the representations made in the offering memorandum.

 E. <u>Nonbinding Letter of Intent</u>

On May 22, 1987, Merrill Parent entered into a nonbinding letter of intent with GATX/BCE for the sale of the stock of ML Capital Resources (nonbinding letter of intent).  The nonbinding letter of intent confirmed that Merrill Parent had provided GATX/BCE with a draft sale agreement containing a description of the assets in which ML Capital Resources had an equity interest as of the proposed closing date.  The nonbinding letter of intent set forth pricing terms identical to those set forth in GATX's April 27, 1987, bid proposal; i.e, $66 million plus 40 percent of

---

[28]The record is unclear as to whether a second round of bids was conducted or whether petitioner merely asked GATX/BCE to modify its original bid.

the discounted value of residual payments in excess of

$29,500,000.  The nonbinding letter of intent specifically stated

that the parties were bound by the terms of their March 23, 1987,

confidentiality agreement.  The nonbinding letter of intent also

stated:

> The consummation of the acquisition contemplated
> herein is subject to (i) negotiation and execution of
> definitive agreements acceptable in form and substance
> to * * * [GATX/BCE] and * * * [petitioner], (ii) no
> change having occurred in the federal income tax laws
> or the regulations of the U.S. Treasury promulgated
> thereunder that would materially adversely alter the
> economic effect of the transactions contemplated
> herein, (iii) approval of the transactions contemplated
> herein by * * * [petitioner's] Executive Committee and
> by the appropriate corporate authorities for * * *
> [GATX/BCE], (iv) consummation of satisfactory secured
> financing by * * * [GATX/BCE] and (v) other customary
> and appropriate closing conditions.

F.  <u>GATX Finance Committee Approval</u>

On or about May 29, 1987, the GATX Finance Committee met to

consider the proposed acquisition of ML Capital Resources.  A

written proposal presented at that meeting stated that GATX was

"awarded the transaction" based on its initial and modified bid

proposals and was "invited to perform a due diligence

investigation."  The written proposal also stated that, upon

completion of the due diligence process, GATX/BCE reserved the

right to adjust the purchase price based on its due diligence

findings in the event that any information in the 3-volume

offering memorandum was incorrect.  The written proposal also

recommended that the base purchase price be reduced to $63.3

million as a result of an increase in the reserve for losses and a net reduction in expected future residual values.

On June 1, 1987, the GATX Finance Committee approved the proposal to acquire the capital stock of ML Capital Resources for a purchase price of $63.3 million, subject to certain specified conditions.  The GATX Finance Committee recommended that the proposed transaction be forwarded to the GATX board of directors.

G.  Continued Negotiations

After executing the nonbinding letter of intent, petitioner and GATX/BCE continued their negotiations.  In conjunction with GATX/BCE's due diligence review of the lease portfolio, petitioner and GATX/BCE agreed that it was impractical to examine each lease separately because the lease portfolio consisted of such a large number of relatively small leases.  Therefore, they agreed to use a "statistical sampling technique", whereby the parties would jointly pick a certain number of leases at random to examine in significant detail and compare them to the representations made by Merrill Parent in the 3-volume offering memorandum.  The results of the "statistical sample" were not satisfactory to GATX/BCE; i.e., a larger than expected portion of the leases did not coincide with Merrill Parent's representations in the 3-volume offering memorandum.

From May 22 through June 25, 1987, negotiations continued in order to accommodate the adjustments revealed by the due

diligence review.  Among other concessions, petitioner represented to GATX that to the best of petitioner's knowledge, as of the date of the closing, the schedules in the contract were the actual status of the individual leases and, to the extent they were not, there would be a postclosing adjustment to accurately reflect the discrepancies.

During the negotiations, GATX requested that ML Vessel Leasing Corporation (Vessel Leasing), a wholly owned subsidiary of ML Capital Resources, not be included in the ML Capital Resources portfolio because GATX/BCE could not own the assets in Vessel Leasing due to restrictions under Federal laws.[29]  By resolution dated June 10, 1987, the respective boards of ML Capital Resources and ML Asset Management approved the sale of all the stock of Vessel Leasing to ML Asset Management.  On that same date, ML Capital Resources and ML Asset Management entered into a stock purchase agreement with respect to Vessel Leasing's stock.  The purchase price for the stock was $367,481.  The sale closed on June 10, 1987.  Immediately before its purchase of Vessel Leasing, ML Asset Management had accumulated earnings and profits that exceeded the purchase price.  This is the eighth cross-chain sale at issue for the taxable year ended December 25,

---

[29]BCE was a Canadian corporation and could not legally own a vessel that had been financed by the U.S. Government.

1987. The parties agree that this cross-chain sale was a section 304 transaction.

H. Sale of ML Capital Resources Is Finalized

By resolution dated June 18, 1987, ML Capital Resources' board of directors authorized the sale of its stock to GATX/BCE. As of June 25, 1987, Merrill Parent, Consumer Markets, ML Capital Resources, and GATX/BCE entered into an agreement for the purchase and sale of stock of ML Capital Resources for a fixed cash consideration of $50,447,996, payable at closing (subject to adjustments for working capital and certain residual proceeds), and a contingent cash payment based on the realization of certain residual values due on or before January 1, 1995, but not to exceed $15 million. The sale closed on June 26, 1987. Merrill Parent represented to GATX/BCE that, to the best of its records and knowledge, as of the date of the closing the schedules attached to the contract would contain accurate information about each of the individual leases. To the extent that the schedules did not contain accurate information, there would be postclosing adjustments. With one exception, Merrill Parent did not guarantee the obligations of the lessees. Merrill Parent also did not guarantee the residual values of any leases.

On its consolidated Federal income tax return for the taxable year ended December 25, 1987, petitioner claimed a long-term capital loss in the amount of $466,985,176 from the sale of

ML Capital Resources' stock, computed as follows:

|  |  |
|---|---|
| Sale price | $49,581,304 |
| Less: basis in ML Capital Resources | 516,566,480 |
| Capital loss | (466,985,176) |

III.  Notice of Deficiency

Respondent mailed a timely notice of deficiency to petitioner on August 20, 1998, which set forth a number of adjustments to petitioner's taxable income for the years at issue.  The only adjustments in dispute are respondent's determinations (i) decreasing the long-term capital loss reported by ML Capital Resources on the 1986 sale of the stock of ML Leasing to Inspiration on the ground that ML Capital Resources' basis in the stock was overstated by $73,320,471, and to (ii) decreasing the long-term capital loss reported by Consumer Markets on the 1987 sale of the stock of ML Capital Resources to GATX/BCE on the ground that Consumer Markets' basis in the stock was overstated by $328,826,143.[30]

OPINION

I.  Applicable Statutes

The parties agree that section 304 applies to the nine cross-chain sales and that section 304 treats the cross-chain

---

[30]The $328,826,143 adjustment to the basis of the stock of Capital Resources in respondent's notice equals the sum of (i) the $53,972,607 aggregate purchase price for the five subsidiaries, (ii) the $154,666,365 initial purchase price for ML Interfunding, (iii) the $119,819,690 final purchase price for Leasing Equipment, and (iv) the $367,481 purchase price of Vessel Leasing.

sales as redemptions.  The parties disagree, however, as to whether the redemptions must be taxed as distributions in exchange for stock under section 302(a) or as distributions of property under section 301.

Before section 304 was enacted, a parent corporation could extract earnings from its related corporations while avoiding ordinary dividend treatment by selling the stock of one of its controlled corporations to another of its controlled corporations.  See, e.g., Wanamaker Trust v. Commissioner, 11 T.C. 365 (1948), affd. per curiam 178 F.2d 10 (3d Cir. 1949).  In 1950, section 304 was enacted to prevent the bailout of corporate earnings and profits through sales involving subsidiary corporations.  See Revenue Act of 1950, ch. 994, 64 Stat.906; see also H. Rept. 2319, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 380, 420; S. Rept. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483, 514.  In 1954, section 304 was amended to prevent the bailout of corporate earnings and profits using brother-sister corporations. See H. Rept. 1337, 83d Cong., 2d Sess. A79 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 239 (1954).  This antibailout provision provides the analytical framework for both parties' arguments in this case.

The pertinent part of section 304(a)(1) provides that, for purposes of section 302, if one or more persons are in control of each of two corporations, and in return for property, one of the

corporations acquires stock in the other corporation from the person so in control, then such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. See also Rev. Rul. 70-496, 1970-2 C.B. 74. If a stock acquisition is governed by section 304(a), any determination as to whether the stock acquisition is to be treated as a distribution in part or full payment in exchange for the stock must be made by reference to the stock of the issuing corporation.[31] Sec. 304(b)(1). Section 318, as modified by section 304(b)(1), applies in determining whether the requisite control under section 304(a) exists.

Section 304(a)(1) recharacterizes what appears to be a sale as a redemption by treating the sale proceeds as a distribution in redemption of the acquiring corporation's stock and requiring that the tax consequences of the distribution be determined under sections 301 and 302. Section 302(a) provides that if a corporation redeems its stock, the redemption shall be treated as a distribution in part or full payment in exchange for the stock if the redemption qualifies as one of four types of redemptions listed in section 302(b)--a redemption that is not essentially equivalent to a dividend (section 302(b)(1)), a substantially disproportionate redemption of stock (section 302(b)(2)), a

---

[31]In this case, the issuing corporations are Merlease, the five subsidiaries, ML Interfunding, Leasing Equipment, and Vessel Leasing. See sec. 304(b)(1).

redemption in complete termination of a shareholder's interest (section 302(b)(3)), or a redemption from a noncorporate shareholder in partial liquidation (section 302(b)(4)). If the deemed redemption does not qualify under section 302(b), then the distribution is governed by section 301.[32]

In this case, respondent relies only upon section 302(b)(3), claiming that the deemed section 304 redemptions, when integrated with the sales of the target corporations, completely terminated the target corporations' ownership of the issuing corporations. Section 302(b)(3) provides that "Subsection(a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder." See Bleily & Collishaw, Inc. v. Commissioner, 72 T.C. 751, 756 (1979), affd. without published opinion 647 F.2d 169 (9th Cir. 1981). The attribution rules under section 318(a) apply in determining ownership of stock for purposes of section 302. See sec. 302(c)(1).

II. The Parties' Arguments Regarding the Applicable Legal Standard

Ordinarily, whether a redemption results in the complete termination of a shareholder's interest in a corporation under section 302 is determined immediately after the redemption. Sec.

---

[32]Sec. 301(a) provides: "Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c)."

302(b)(3) and (c)(2)(A).  In some circumstances, however, both taxpayers and the Commissioner have argued that a redemption should not be tested under section 302(b) immediately after the redemption but only after another related transaction has occurred.  See, e.g., Bleily & Collishaw, Inc. v. Commissioner, supra; Niedermeyer v. Commissioner, 62 T.C. 280 (1974), affd. 535 F.2d 500 (9th Cir. 1976).

In this case, petitioner contends that the deemed section 304 redemptions, i.e., the nine cross-chain sales, should be tested under section 302(b)(3) without integrating them with the later sales of the target corporations.  Petitioner asserts that the deemed section 304 redemptions, standing alone, did not completely terminate the target corporations' actual and constructive ownership interest in the issuing corporations because, under the attribution rules of section 318, the target corporations continued to hold an ownership interest in those corporations following the redemptions.  Respondent contends, however, that the section 304 redemptions at issue in this case, i.e., the nine cross-chain sales, must be integrated with the later sales of the target corporations in order to decide under section 302(b)(3) whether the target corporations' constructive ownership of the transferred stock under section 318 was completely terminated.  The parties rely on different legal standards in support of their respective positions.

Petitioner relies on a test articulated by this Court in Niedermeyer v. Commissioner, supra at 291. Petitioner claims that this Court has consistently used the Niedermeyer test to decide whether a redemption should be integrated with other allegedly related transactions in order to ascertain the tax consequences of the redemption. In Niedermeyer, we held that, if a redemption, standing alone, fails to qualify under section 302(b)(3), the redemption will nevertheless be subject to sale or exchange treatment "Where there is a plan which is comprised of several steps, one involving the redemption of stock that results in a complete termination of the taxpayer's interest in a corporation". Id. at 291. However, we required that "the redemption must occur as part of a plan which is firm and fixed and in which the steps are clearly integrated." Id. Petitioner describes the Niedermeyer test as a "variation of the step transaction doctrine" and asserts that "While the test permits amalgamation of steps that are not subject to an 'absolutely' binding contract, it leaves little room for contingency".

Petitioner relies on this Court's opinions in Monson v. Commissioner, 79 T.C. 827, 837 (1982), Roebling v. Commissioner, 77 T.C. 30 (1981), and Bleily & Collishaw, Inc. v. Commissioner, supra at 756, to support its position. According to petitioner, each of the three above-cited cases had the following facts in common: (1) Each case involved a partial redemption that was

held to be part of a firm and fixed plan; (2) in each case, the complete termination of the shareholder's interest required a party not controlled by the taxpayer to acquire the remaining shares; and (3) at the time of the redemption, the third-party purchaser had already negotiated for and made a firm commitment to acquire the remaining shares. Petitioner extracts from the cases the conclusions that, where an alleged plan to completely terminate a shareholder's ownership requires the participation of a third party, the third party must have committed to the plan at least in substance on or before the redemption date in order for Niedermeyer's "firm and fixed plan" requirement to be satisfied and that a taxpayer's unilateral plan can never be a firm and fixed plan. Petitioner's analysis and arguments, therefore, focus primarily on whether there was an agreement in substance with the third-party purchasers of the target corporations' stock on the dates of the deemed section 304 redemptions; i.e., the nine cross-chain sales.

Respondent rejects petitioner's attempt to focus the Court's eye primarily on the third-party purchasers who acquired the target corporations' stock and argues for the application of an intent-based test drawn from the decision of the U.S. Court of Appeals for the Sixth Circuit in Zenz v. Quinlivan, 213 F.2d 914 (6th Cir. 1954) and pertinent opinions of this Court, including but not limited to, Niedermeyer v. Commissioner, supra. Citing

Zenz, respondent argues that a partial redemption, which is one of a series of transactions intended to terminate completely a shareholder's ownership interest in a corporation, must be integrated with the related transactions for purposes of section 302(b)(3) and treated as a sale or exchange.  Under respondent's articulation of the relevant legal standard:

> As a result of the decision in Zenz, other transactions must be taken into account in testing whether a redemption is a distribution under § 301 or a sale or exchange under § 302(a) where the redemption is part of a firm and fixed plan to terminate a shareholder's interest in a corporation.  Niedermeyer v. Commissioner, 62 T.C. 280 (1974), aff'd 535 F.2d 500 (9th Cir. 1976) (articulating a Zenz-like standard). As subsequent applications of the Zenz doctrine make clear, the sequence of planned transactions is irrelevant where the overall result is the complete termination of a shareholder's interest.  United States v. Carey, 289 F.2d 531 (8th Cir. 1961) (holding that Zenz applies when the redemption precedes the stock sale pursuant to a plan); see also B. Bittker and J. Eustice, Federal Income Taxation of Corporations and Shareholders, ¶9.06[3] at 9-42 (6th ed. 1994)("[I]f the form of the distribution is cast as a redemption, its treatment as a sale under Zenz is highly likely unless the preliminary redemption transaction can be separated from the later sale.")  [Fn. ref. omitted.]

In its reply brief,[33] petitioner dismisses respondent's reliance

---

[33]In their reply briefs, both parties argue alternatively that the applicable standard is derived from the step transaction doctrine and that one of three tests for deciding whether the step transaction doctrine should be applied, but not all three tests, must be used in this case to analyze the sec. 304 redemptions and the later sales.  Petitioner contends that only the binding commitment test should be used, and respondent contends that only the end result test should be used.  For a detailed description of the three tests, see Andantech L.L.C. v. Commissioner, T.C. Memo. 2002-97.  We decline to apply any of the

(continued...)

on Zenz, claiming that "its relevance to this case is at best tangential." Petitioner notes that Zenz involved both a tax year prior to the enactment of section 302 and a different factual situation. In Zenz, the sole shareholder of a corporation sold some of her stock first, and a short time later, the issuing corporation redeemed the remainder of her stock. Petitioner distinguishes Zenz from the instant case because "The order of sale and subsequent redemption was chosen to reduce taxes--that is, to avoid dividend treatment from the redemption leg", the redemption completely terminated the taxpayer's interest in the corporation, and the Commissioner was attempting to reorder the transactions in order to obtain dividend treatment for the redemption proceeds. Petitioner urges this Court to limit the application of the Zenz intent-based test to cases where the form of the transactions and the intent of the taxpayer coincide as it did in Zenz and to decline to apply the test in cases such as this where the issue to be decided is "whether a redemption that does not terminate the shareholder's interest and a later sale that does terminate that interest are sufficiently related to justify treating a non-terminating redemption as part of the later sale transaction."

_____

³³(...continued)
three tests because the applicable legal standard is that identified elsewhere in this Opinion.

III.  Analysis of the Nine Cross-Chain Sales

    A.  In General

Each party claims that the applicable legal standard is clear and that the legal standard, when applied to the facts, supports a decision in that party's favor.  The parties rely on many of the same cases to support their respective positions.  The parties' arguments, however, are so diametrically opposite regarding their interpretation of the cases that we must turn to an examination of the principal cases on which both parties rely.[34]  A careful examination of the pertinent facts and holdings of these cases is necessary to respond adequately to the parties' detailed and often tortured parsing of these cases in support of their respective arguments.

---

[34]Petitioner also relies on several anticipatory dividend cases to bolster its arguments regarding the cross-chain sales. See TSN Liquidating Corp., Inc. v. United States, 624 F.2d 1328 (5th Cir. 1980); Litton Indus., Inc. v. Commissioner, 89 T.C. 1086 (1987); Gilmore v. Commissioner, 25 T.C. 1321 (1956); Coffey v. Commissioner, 14 T.C. 1410 (1950); Rosenbloom Fin. Corp. v. Commissioner, 24 B.T.A. 763 (1931).  In each of the anticipatory dividend cases decided by this Court, we held that a corporation's distribution of a dividend to a shareholder before the shareholder sold his stock was taxable as a dividend and not as part of the later stock sale.  The dividend transactions did not involve the exchange of stock for consideration.  We agree with respondent that the anticipatory dividend cases are distinguishable from this case, and we do not consider them further.  See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.07[2][a], at 8-66 (7th ed. 2002) ("In order to obtain the hoped-for dividend result, it is important that the selling shareholder not surrender any of its target stock to the corporation because use of the redemption format will likely trigger sale treatment.")

1. Zenz v. Quinlivan

In Zenz v. Quinlivan, 213 F.2d 914 (6th Cir. 1954), the sole shareholder of a corporation decided to sell the corporation to a competitor. Because the competitor did not want to assume the tax liabilities associated with the corporation's accumulated earnings and profits, the competitor purchased only part of the shareholder's stock. Three weeks later, after a corporate reorganization and corporate action, the corporation redeemed the balance of the shareholder's stock. On her tax return, the redeemed shareholder reported the transaction as a redemption of all of her stock under section 115(c) of the Internal Revenue Code of 1939 and claimed that the transaction must be treated as a sale or exchange of stock. The Commissioner determined that the redemption was essentially equivalent to the distribution of a taxable dividend and recharacterized the redemption proceeds as dividend income.

The Court of Appeals for the Sixth Circuit reversed the decision of the lower court, which had upheld the Commissioner's determination. The Court of Appeals acknowledged the "general principle" that "a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes or altogether avoid them, by means which the law permits." Zenz v. Quinlivan, supra at 916. The Court of Appeals refused to decide the issue presented based on the taxpayer's motivation to avoid taxes.

Instead, it examined the nature of the transaction in order to decide if it was, in substance, a dividend distribution or a sale. The Court of Appeals held that the redemption was not essentially equivalent to the distribution of a dividend because the taxpayer intended "to bring about a complete liquidation of her holdings and to become separated from all interest in the corporation", and the redemption completely terminated her interest in the corporation. Id. at 917.

### 2. Niedermeyer v. Commissioner

Twenty years after Zenz v. Quinlivan, supra, was decided, this Court decided the tax effect of a sale in the context of section 304. In Niedermeyer v. Commissioner, 62 T.C. 280 (1974), the relevant issues were whether the taxpayers' sale of all of their common stock in American Timber & Trading Co., Inc. (AT&T) to Lents Industries, Inc. (Lents) was a redemption involving a related corporation under section 304(a)(1) of the Internal Revenue Code of 1954 and, if so, whether the redemption should be treated as a distribution in exchange for the redeemed stock under section 302(a) or as a distribution to which section 301 applies. The taxpayers in Niedermeyer sold all of their common stock but not their preferred stock in AT&T to Lents on September 8, 1966. On the date of the sale, the majority of Lents' stock was owned by the taxpayers' sons. On December 28, 1966, the taxpayers contributed their AT&T preferred stock to the

Niedermeyer Foundation, a tax-exempt organization. The taxpayers alleged that the distribution by Lents to them was in exchange for their AT&T stock. The Commissioner alleged that the sale was a section 304 transaction between related corporations and that the distribution was a taxable dividend under sections 301 and 302.

This Court first considered whether the sale was a deemed redemption under section 304(a)(1). After applying the constructive ownership rules of section 318(a) as required by section 304(c), this Court concluded that the taxpayers were in control of both AT&T and Lents immediately prior to the sale and that the transaction in which Lents acquired the taxpayers' AT&T common stock must be treated as a redemption under section 304(a)(1).

This Court then addressed the taxpayers' contention that, even if the sale were treated as a deemed redemption under section 304(a)(1), the taxpayers nevertheless were entitled to treat the distribution from Lents as full payment in exchange for their AT&T stock under section 302(a) by meeting one of the conditions of section 302(b). After rejecting the taxpayers' argument under section 302(b)(1), the Court turned to their arguments under section 302(b)(3). Among other things, the taxpayers argued that the distribution was in complete termination of their ownership interest in AT&T, contending that

the distribution and their subsequent gift of their AT&T preferred stock were parts of a single plan to completely terminate their actual and constructive ownership of AT&T before the end of 1966.

In <u>Niedermeyer</u>, this Court acknowledged that, where there is a plan consisting of a redemption and one or more other steps that results in a complete termination of the taxpayer's interest in a corporation, section 302(b)(3) may apply. <u>Niedermeyer v. Commissioner</u>, <u>supra</u> at 291 (citing in support <u>Leleux v. Commissioner</u>, 54 T.C. 408 (1970); <u>Estate of Mathis v. Commissioner</u>, 47 T.C. 248 (1966)). The Court emphasized, however, that the redemption "must occur as part of a plan which is firm and fixed and in which the steps are clearly integrated." <u>Id.</u>

After searching the record for evidence in support of the taxpayers' alleged plan, the Court concluded that the evidence presented was "too insubstantial to prove the existence of such a plan." <u>Id.</u> Among the facts on which the Court relied were the following:

(1) The alleged plan was not in writing, and there was no indication that the taxpayers communicated their donative intention to the charity or to anyone.

(2) The taxpayers' son who testified at trial about the Lents stock acquisition did not mention any desire on the

taxpayers' part to completely terminate their ownership interest in AT&T.

(3) The taxpayers could easily have changed their minds regarding their avowed intention to donate their preferred stock.

(4) The taxpayers failed to show that their alleged decision to donate the preferred stock was in any way fixed or binding. This Court emphasized that a plan sufficient to pass muster under section 302(b)(3) did not need to be "in writing, absolutely binding, or communicated to others" but that "the above-mentioned factors, all of which are lacking here, tend to show a plan which is fixed and firm." Id. at 291-292.

Although the Court in Niedermeyer did not expressly state that the plan to which it was referring was a plan of the taxpayers, such a conclusion is warranted. The Court rejected the taxpayers' self-serving testimony regarding their intention to donate and searched instead for objective evidence that the deemed section 304 redemption and the later gift were integrated parts of a firm and fixed plan on the part of the taxpayers to completely terminate their ownership interest; i.e., a plan consisting of clearly integrated steps to which the taxpayers were firmly committed.

### 3. Benjamin v. Commissioner

In Benjamin v. Commissioner, 66 T.C. 1084 (1976), affd. 592 F.2d 1259 (5th Cir. 1979), the issue presented was whether the

redemption of the taxpayer's class A preferred voting stock by a family-held corporation was essentially equivalent to a dividend under section 302(b)(1) of the Internal Revenue Code of 1954. In deciding the tax effect of the redemption, this Court addressed the taxpayer's argument that the redemption was pursuant to a plan of redemption that, when fully implemented, would completely terminate the taxpayer's ownership interest. The evidence at trial failed to disclose any common understanding among the shareholders or the redeeming corporation as to the timing of, or procedure for, the alleged redemption plan, nor was there any evidence of a concrete plan involving the shareholders or the corporation. After examining the record, this Court concluded there was no credible evidence of any firm plan to redeem, noting that "vague anticipation" was not enough to constitute a plan. Id. at 1114.

4. Paparo v. Commissioner

In Paparo v. Commissioner, 71 T.C. 692 (1979), the taxpayers were shareholders of Nashville Textile Corp. (Nashville) and Jasper Textile Corp. (Jasper), two women's apparel manufacturers, and House of Ronnie, Inc. (Ronnie), the corporation that designed and marketed the clothing made by Nashville and Jasper. In order to improve their sales development effort, the taxpayers approached I. Amsterdam, a successful sales organization. The shareholders of I. Amsterdam also owned Denise Lingerie Co., a

women's apparel manufacturer.  The taxpayers concluded that if Ronnie could acquire Denise in exchange for Ronnie's stock, Ronnie would acquire not only Denise's manufacturing facilities but also the sales relationship with I. Amsterdam.  In the early part of 1969, negotiations began.  Denise's shareholders were interested in the taxpayer's acquisition proposal but would not consider accepting stock in a privately held corporation.

In conjunction with the proposed acquisition of Denise, the taxpayers began to explore taking Ronnie public.  The underwriter they had selected recommended that Nashville and Jasper be combined with Ronnie before the public offering.  In January 1970, the taxpayers and another shareholder of Nashville and Jasper agreed to sell all of their stock to Ronnie for $800,000.  The taxpayers contemplated that the purchase price would be paid from the proceeds of one or more public offerings of Ronnie's stock.

On March 30, 1970, the first public offering of Ronnie's stock was made.  A portion of the sales proceeds was used to make the downpayment to the Nashville and Jasper shareholders.

On October 30, 1970, Ronnie entered into an agreement with Denise's shareholders to acquire all of Denise's outstanding stock in exchange for Ronnie's stock.

On April 20, 1972, a second public offering of Ronnie's stock was made.  A portion of the proceeds was used to pay the

balance of the purchase price owed to the Nashville and Jasper

shareholders.

The sole issue for decision was whether the amounts received

by the taxpayers in 1970 and 1971 from Ronnie in exchange for

their stock in Nashville and Jasper were taxable as capital gains

under section 302,[35] or as dividends under section 301.  The

parties agreed that section 304 applied to the stock acquisitions

in question and that, therefore, the transfer of Nashville and

Jasper stock to Ronnie must be characterized as a redemption

through the use of related corporations.  The parties disagreed

only with respect to the application of section 302.  The

taxpayers contended that the redemptions qualified as sales under

section 302(a) because they met the requirements of either

section 302(b)(1) or (2).  The taxpayers argued that the 1970

redemption was but one step in an overall plan to redeem their

interest in Nashville and Jasper that ended in 1972 with the

second public offering, and it was not the essential equivalent

of a dividend.

This Court rejected the taxpayers' argument, concluding that

the record did not contain any compelling evidence of an overall

financial plan covering both the first and the second public

offerings.  No formal written plan for the funding of the

---

[35]Relevant Code provisions were from the Internal Revenue
Code of 1954.

redemption through subsequent public offerings of Ronnie's stock existed, and no corporate minutes were offered into evidence to substantiate such a plan. In addition, funding the redemption through subsequent public offerings of Ronnie's stock was beyond the control of the taxpayers. Although this Court acknowledged the taxpayers' apparent intent that subsequent public offerings be made, the taxpayers had made no promise to the underwriter, nor was there any evidence of an agreement to make another public offering.

### 5. Bleily & Collishaw, Inc. v. Commissioner

In Bleily & Collishaw, Inc. v. Commissioner, 72 T.C. 751 (1979), the taxpayer owned 30 percent of a corporation. The majority shareholder wanted sole control over the corporation, and the taxpayer was willing to sell all of its shares to the majority shareholder. However, because the majority shareholder did not have sufficient funds to purchase all of the taxpayer's shares at that time, the majority shareholder purchased only a portion of the taxpayer's stock. Thereafter, over a period of approximately 23 weeks, the corporation redeemed the balance of the taxpayer's stock in increments tied to the availability of money to fund the redemptions. Although the taxpayer was under no contractual or other legal obligation to sell the rest of its shares or have them redeemed if and when money became available to fund additional acquisitions, this Court found that the

taxpayer intended to sell its shares whenever the money needed to fund the acquisitions became available.

In Bleily & Collishaw, Inc., the issue before the Court was whether the redemptions met the requirements of section 302(b)(3) of the Internal Revenue Code of 1954. We described the applicable legal standard as follows:

> Where several redemptions have been executed pursuant to a plan to terminate a shareholder's interest, the individual redemptions constitute, in substance, the component parts of a single sale or exchange of the entire stock interest. We have refused, however, to treat a series of redemptions as a single plan unless the redemptions are pursuant to a firm and fixed plan to eliminate the stockholder from the corporation.
> Generally, a gentleman's agreement lacking written embodiment, communication, and contractual obligations will not suffice to show a fixed and firm plan. On the other hand, a plan need not be in writing, absolutely binding, or communicated to others to be fixed and firm although these factors all tend to indicate that such is the case. [Id. at 756; citations omitted.]

Noting that whether a firm and fixed plan existed in a given case is necessarily a fact issue, we held that the requirements of section 302(b)(3) were met because the redemptions were part of a firm and fixed plan to eliminate the stockholder from the corporation. The record established that the corporation planned to eliminate the taxpayer as a shareholder and that the taxpayer had agreed to the sale of all its shares and to the purchase price, even though there was no binding obligation on either party to consummate additional stock sales.

6.  Roebling v. Commissioner

In Roebling v. Commissioner, 77 T.C. 30 (1981), a taxpayer owned approximately 90 percent of the class B preferred stock and approximately 45 percent of the common stock of Trenton Trust Co. (Trenton Trust).  In 1958, Trenton Trust adopted a plan of recapitalization to simplify and strengthen its capital structure which, among other things, called for the redemption of a specified amount of the class B preferred stock each year and required Trenton Trust to establish a sinking fund for that purpose.  During each of the years 1965-69, part of the taxpayer's class B preferred stock was redeemed, and in 1965 and 1966, the taxpayer sold some shares.  Among the issues presented to this Court was whether the redemption of the taxpayer's class B preferred shares was not essentially equivalent to a dividend within the meaning of section 302(b)(1) of the Internal Revenue Code of 1954.

Each year, Trenton Trust set aside funds and decided how much of those funds it would use to retire the class B preferred shares.  Each retirement of shares required action of Trenton Trust's board of directors and the consent and approval of the FDIC and the Department of Banking and Insurance of the State of New Jersey.  Each year, Trenton Trust's board of directors adopted a resolution to apply for the necessary regulatory approvals, and Trenton Trust then filed its applications.  For

most of the relevant years, the applications were granted at least in part, but on one occasion the application was denied.

Although the taxpayer in Roebling relied only upon section 302(b)(1) to support her contention that each of the redemptions qualified as a sale or exchange under section 302(a), she argued that the redemptions were integrated steps in a firm and fixed plan to redeem all of the preferred stock and that the redemptions in the aggregate resulted in a meaningful reduction of the taxpayer's interest in Trenton Trust.  Applying the same analysis used in cases involving section 302(b)(3), this Court held that the redemptions were integrated steps in a firm and fixed plan even though there was no binding commitment on the part of Trenton Trust to acquire the taxpayer's shares or on the taxpayer's part to tender her shares.  The Court acknowledged that each redemption was subject to the financial condition of the bank and required regulatory approval, but emphasized that "this was about as firm and fixed a plan as a bank could have under the circumstances."  Roebling v. Commissioner, supra at 55.

### 7.  Monson v. Commissioner

In Monson v. Commissioner, 79 T.C. 827 (1982), a closely held corporation owned by the taxpayer and his children redeemed all of the children's stock and a portion of the taxpayer's stock on July 30, 1976.  Immediately following the redemption, the taxpayer was the corporation's sole shareholder.  On August 2,

1976, the taxpayer sold all of his shares to a third party for cash and a promissory note.  Minutes of a board of directors meeting held on July 30, 1976, described the redemption and the subsequent sale of taxpayer's remaining stock to a third party as steps in the sale.  The taxpayer reported the redemption proceeds as income from the sale or exchange of stock under section 302(a).

Citing Zenz v. Quinlivan, 213 F.2d 914 (6th Cir. 1954), this Court examined the record to determine whether the intent of the taxpayer was to bring about a complete liquidation of his ownership interest in his corporation.  Monson v. Commissioner, supra at 835-836.  Because the record clearly established that the redemption of the taxpayer's stock was part of an overall plan to terminate his entire interest in his closely held corporation, this Court held that the redemption was either a complete termination of the taxpayer's interest under section 302(b)(3) or was not essentially equivalent to a dividend under section 302(b)(1).  Id. at 837.  In either event, section 302(a) required the redemption to be treated as a sale.  Id.

### 8.  Applicable Legal Principles

The above-cited cases decided by this Court confirm that this Court has not integrated a redemption with one or more other transactions to decide whether the requirements of section 302(b) are met unless the redemption was part of a firm and fixed plan

to satisfy one of the conditions of section 302(b) (such as, in the case of section 302(b)(3), the complete termination of the taxpayer's ownership in the issuing corporation), and the steps of the plan were clearly integrated. Bleily & Collishaw, Inc. v. Commissioner, 72 T.C. at 756; Niedermeyer v. Commissioner, 62 T.C. at 291. Whether or not a plan existed is an issue of fact that must be resolved on the basis of all of the relevant facts and circumstances of a particular case. Bleily & Collishaw, Inc. v. Commissioner, supra at 756. The taxpayer has the burden of proving that the Commissioner's position regarding the existence or nonexistence of a plan is erroneous. Rule 142(a).[36]

An analysis of whether or not a firm and fixed plan existed necessarily entails an examination of the taxpayer's intent. See Monson v. Commissioner, supra at 835-836 (citing Zenz v. Quinlivan, supra, with approval); Niedermeyer v. Commissioner, supra at 291 ("there was no evidence of communication of petitioners' asserted donative intention to the charity or to anyone"). It is the taxpayer's intention, as manifested by the taxpayer's participation in and agreement to the plan, that the search for a plan is designed to reveal. However, a taxpayer's self-serving statement regarding its intent or regarding the

---

[36]Petitioner has not argued that the burden of proof should be placed on respondent, and we infer from the record that sec. 7491 does not apply because the examination in this case began before its effective date.

existence of a plan is given very little weight in the absence of supporting evidence tending to show that the Commissioner's position is erroneous.  Niedermeyer v. Commissioner, supra at 291.  Instead, this Court has relied primarily on objective evidence, such as a written plan, corporate minutes confirming the existence of a plan, or a writing or other communication from an involved third party, or the lack thereof, as the most compelling evidence of the existence of a firm and fixed plan evidencing a taxpayer's intention regarding the redemption of its stock.  Id.; see also Monson v. Commissioner, supra; Roebling v. Commissioner, 77 T.C. 30 (1981); Bleily & Collishaw, Inc. v. Commissioner, supra.  By focusing on the intent of the redeeming corporation and the redeemed shareholder on the date of the redemption, both this Court and the Court of Appeals for the Sixth Circuit in Zenz have attempted to cull after-the-fact attempts on the part of taxpayers to link unrelated transactions in order to achieve favorable tax treatment, see Niedermeyer v. Commissioner, supra, from those situations where the taxpayer intentionally structures two or more transactions as part of a plan to terminate the taxpayer's ownership interest in a corporation, see Zenz v. Quinlivan, supra.

An analysis of whether or not a firm and fixed plan existed also entails an examination of any uncertainty in consummating the alleged plan.  Although a binding commitment to the plan is

not required, whether the redeeming corporation and the redeemed shareholder have demonstrated their intention to consummate the alleged plan in some meaningful way is an important factor. Bleily & Collishaw, Inc. v. Commissioner, supra at 757 ("Collishaw had agreed to the sale of all its shares and to the purchase price. As noted before, the fact that the agreement was not binding is not dispositive."); Niedermeyer v. Commissioner, supra at 291 ("Petitioners could easily have changed their minds with regard to any intent to donate the preferred stock. Clearly petitioners' decision to donate the preferred stock has not been shown to be in any way fixed or binding."). If the taxpayer is the sole shareholder of a closely held corporation and could easily change his mind regarding the implementation of the alleged plan, this Court has demanded compelling evidence of the taxpayer's commitment to the plan before it will find that a firm and fixed plan existed. Niedermeyer v. Commissioner, supra at 291. If, however, the taxpayer is a shareholder of a more broadly held close corporation or a publicly held corporation, this Court's analysis has focused primarily on the redeeming corporation's commitment to the plan. For example, in Roebling v. Commissioner, supra at 55, a case involving the periodic redemption of a banking institution's preferred shareholders, we stated that--

> While we realize that this redemption plan was
> subject to the financial condition of the bank and the

> approval each time of the banking authorities, we think this was about as firm and fixed a plan as a bank could have under the circumstances. See <u>Bleily & Collishaw, Inc. v. Commissioner</u>, <u>supra</u>. We do not believe the requirement of a firm and fixed plan for redemption need be as rigid under the circumstances here involved as would be required in a closely held family corporation situation where the plan could be changed at any time by the actions of one or two shareholders. Compare <u>Niedermeyer v. Commissioner</u>, <u>supra</u>, and <u>McDonald v. Commissioner</u>, 52 T.C. 82 (1969).

As this Court's opinion in <u>Roebling</u> confirms, the existence of conditions, contingencies, or other uncertainties will not necessarily preclude a finding that a firm and fixed plan exists but is one factor that the Court must consider in reaching its decision.

B. <u>The Section 304 Redemptions</u>

The foregoing cases and the principles we have extracted from them require that we examine the facts in order to decide whether petitioner engaged in the cross-chain sales and the later sales of the target corporations as part of a firm and fixed plan to completely terminate the target corporations' actual and constructive ownership of the issuing corporations.

1. <u>The 1986 Cross-Chain Sale of Merlease</u>

Petitioner's evidence at trial focused almost exclusively on the lack of any binding commitment or even an agreement in principle between petitioner and Inspiration, the ultimate purchaser of ML Leasing, on the date of ML Leasing's cross-chain sale of its Merlease stock to ML Asset Management. On the date

of the cross-chain sale, Inspiration had not yet completed its due diligence, contractually committed itself to buy the stock of ML Leasing, or finalized its financing arrangements. Moreover, on the date of the cross-chain sale, the board of directors of Merrill Parent had not yet authorized the sale of ML Leasing's stock, and Inspiration had not yet approved the purchase. The existence of these uncertainties according to petitioner precludes any finding that the cross-chain sale was part of a firm and fixed plan to terminate ML Leasing's actual and constructive ownership of Merlease. We disagree.

Whether a redemption and later sale are integrated steps in a firm and fixed plan is a factual determination that necessarily focuses on the actions of the redeemed shareholder and the redeeming corporation. See Roebling v. Commissioner, supra; Niedermeyer v. Commissioner, 62 T.C. 280 (1974). If the actions of the redeemed shareholder and the redeeming corporation evidence a firm and fixed plan to participate in two or more related transactions that, individually or collectively, qualify as a redemption under section 302(b), then the redemption executed pursuant to the plan will qualify as a sale or exchange under section 302(a). Niedermeyer v. Commissioner, supra.

After examining the actions of the redeemed shareholder (ML Leasing), the redeeming corporation (ML Asset Management), and Merrill Parent, we are convinced that the deemed redemption under

section 304, i.e., the cross-chain sale, and the later sale of ML Leasing outside the consolidated group were two steps in a firm and fixed plan to terminate ML Leasing's actual and constructive ownership of Merlease, the issuing corporation.

The principal, and most compelling, evidence on which we rely is the formal presentation of the plan to Merrill Parent's board of directors, which took place on July 28, 1986, only 4 days after the cross-chain sale of Merlease. The formal presentation included the distribution of a written summary and slides illustrating the details of the plan to dispose of petitioner's proprietary lease business culminating in the sale of ML Leasing. The written summary laid out each step of the plan. Among the steps identified were (1) the cross-chain sale of Merlease, which the summary acknowledged had already occurred, (2) the distribution of a dividend by ML Leasing to ML Capital Resources consisting of the cash received in the cross-chain sale by ML Leasing from ML Asset Management and other assets, and (3) the imminent sale of ML Leasing to Inspiration. The written summary described the tax benefits of the plan, which were predicated on an increase in Merrill Parent's basis in ML Leasing under the consolidated return regulations for the proceeds of the cross-chain sale. The written summary confirmed that the plan included the sale of ML Leasing and unequivocally identified Inspiration as the purchaser.

The written summary also confirmed that, although the sale of ML Leasing had not yet been finalized, the sale was sufficiently mature that the establishment of a tax reserve for the transaction was warranted.  In fact, the written summary included a recommendation to the board of directors that a tax reserve specifically geared, in part, to the extraordinary basis adjustment resulting from the section 304 redemption be approved.

Petitioner seeks to minimize the impact of the written summary by pointing out that the summary was prepared for a board of directors meeting that occurred 4 days <u>after</u> the cross-chain sale.  Although petitioner is correct regarding the chronology, petitioner offered us no proof that the plan suddenly sprang to life after the cross-chain sale had occurred, or that the cross-chain sale and the later sale of ML Leasing were unrelated.  In fact, petitioner introduced very little evidence regarding the development, review, and approval of the plan reflected in the written summary, even though the plan was the product of petitioner's own internal planning.

The July 28, 1986, board of directors meeting was a regular board of directors meeting.  Ordinarily, a corporation is required by its bylaws and/or by State law to provide reasonable advance notice to its directors of a regular board meeting.  We believe that it is reasonable to infer from this record that the plan outlined in the written summary and presented to Merrill

Parent's board of directors on July 28, 1986, had been carefully constructed, vetted, finalized, and approved by the appropriate corporate officers by at least July 24, 1986, the date of the 1986 cross-chain sale, and in sufficient time before the July 28, 1986, board of directors meeting to enable the notice of meeting to be given and the meeting materials to be collated and distributed to the directors.

We also note that, on the date of the cross-chain sale, petitioner had identified Inspiration as the purchaser of ML Leasing and had already engaged in substantial negotiations with Inspiration. In fact, petitioner and Inspiration had agreed in principle to a purchase price that was used to calculate the estimated tax benefits in the written summary presented to the board of directors. An inference can also be drawn from the record that, after a meeting on June 23, 1986, Inspiration confirmed informally that it was prepared to purchase ML Leasing's stock, subject to verification of the residual lease values by an outside appraiser. It was only after such confirmation was presumably received that petitioner proceeded with the cross-chain sale.

A firm and fixed plan does not exist for purposes of section 302 when there is only "vague anticipation" that a particular step in an alleged plan will occur. Benjamin v. Commissioner, 66 T.C. at 1114. The facts in this case, however, establish much

more than vague anticipation that the sale of ML Leasing's stock would occur. The facts establish the existence of a firm and fixed plan on the part of Merrill Parent, ML Leasing, ML Asset Management, and Merlease to engage in a multistep transaction specifically designed to dispose of petitioner's proprietary leasing business outside of the consolidated group while eliminating gain on the transaction through basis adjustments resulting from the interplay of section 304 with the consolidated return regulations.

We find that a firm and fixed plan to dispose of ML Leasing outside the consolidated group existed on the date of the 1986 cross-chain sale, and that the 1986 cross-chain sale, the distribution of a dividend of the gross sale proceeds, and the sale of ML Leasing were integrated steps in that plan. Because the 1986 cross-chain sale (the deemed section 304 redemption), when integrated with the sale of ML Leasing's stock, resulted in the complete termination of ML Leasing's actual and constructive ownership interest in Merlease (the issuing corporation), see sec. 304(b), we hold that the redemption qualified under section 302(b)(3), and that, therefore, the redemption shall be treated as a payment in exchange for stock under section 302(a) and not as a dividend under section 301.

2.  The 1987 Cross-Chain Sales of the Five
    Subsidiaries, ML Interfunding, and Leasing
    Equipment

Petitioner makes similar factual and legal arguments with respect to the 1987 cross-chain sales. Because the factual and legal arguments are virtually identical for all of the 1987 cross-chain sales except the one involving Vessel Leasing, we shall consider them together, excluding only Vessel Leasing.

Like petitioner's evidence regarding the 1986 cross-chain sale, petitioner's evidence regarding the 1987 cross-chain sales focused almost exclusively on the lack of any binding commitment or even an agreement in principle between petitioner and GATX/BCE, the ultimate purchaser of ML Capital Resources, on the dates of the 1987 cross-chain sales. Seven of the eight 1987 cross-chain sales occurred on March 30, 1987 (the five subsidiaries and ML Interfunding), and April 3, 1987 (Leasing Equipment). On those dates, GATX/BCE had not had any meaningful opportunity to review the 3-volume offering memorandum or to conduct its due diligence investigation, and had not contractually committed itself to buy ML Capital Resources' stock. Neither the board of directors of Merrill Parent nor the board of directors of GATX/BCE had approved the transaction. Petitioner argued that the existence of these uncertainties precludes any finding that the cross-chain sale was part of a firm and fixed plan to terminate ML Capital Resources' actual and

constructive ownership of the issuing corporations.  Again, we
disagree.

After examining petitioner's actions including those of the
redeemed shareholder (ML Capital Resources), the redeeming
corporations (ML Realty, ML Asset Management, and MLPFS), and
Merrill Parent, we are convinced that the section 304 deemed
redemptions, i.e., the 1987 cross-chain sales, and the later sale
of ML Capital Resources to GATX/BCE were steps in a firm and
fixed plan to terminate ML Capital Resources' actual and
constructive ownership of the issuing corporations.

As with the 1986 cross-chain sale, the most compelling
evidence of a firm and fixed plan with respect to the 1987 cross-
chain sales is the formal presentation of the plan to Merrill
Parent's board of directors, which took place on April 23, 1987,
2 days after receipt of GATX/BCE's bid and approximately 3 weeks
after seven of the eight 1987 cross-chain sales closed.  The
formal presentation included the distribution of a written
summary and slides illustrating the details of the plan to
dispose of ML Capital Resources using much of the same language,
format, and reasoning as that used in the 1986 written summary.
The written summary laid out each step of the plan.  Among the
steps identified were (1) the cross-chain sales of the seven
subsidiaries, which the summary acknowledged had already
occurred, (2) the distribution of a dividend by ML Capital

Resources to its sole shareholder, ML Consumer Markets Holdings, Inc., of the consideration received in the cross-chain sales, and (3) the imminent sale of ML Capital Resources to GATX/BCE. The written summary described the tax benefits of the plan, which were predicated on an increase in petitioner's basis in ML Capital Resources under the consolidated return regulations for the proceeds of the cross-chain sales. The written summary confirmed that the plan included the sale of ML Capital Resources and described GATX/BCE as the "likely purchaser".

The written summary confirmed that, although the sale of ML Capital Resources had not yet been finalized and the sale negotiations were not as far along as those in 1986, the negotiations were sufficiently mature and the sale sufficiently likely to occur that the establishment of a tax reserve for the transaction was warranted. The written summary included a recommendation to the board of directors that a tax reserve specifically geared, in part, to the basis adjustment resulting from the section 304 redemptions be approved. In response to the presentation regarding the plan, Merrill Parent's board of directors approved the plan, ratified the cross-chain sales, and authorized the appropriate officers to finalize the sale of ML Capital Resources.

Petitioner attempts to minimize the impact of the written summary by pointing out that the summary was prepared for a board

of directors meeting that occurred approximately 3 weeks <u>after</u> the 1987 cross-chain sales. Although petitioner is correct regarding the chronology, petitioner offered us no proof that the plan suddenly sprang to life after the 1987 cross-chain sales had closed or that the 1987 cross-chain sales and the later sale of ML Capital Resources were unrelated. In fact, petitioner introduced very little evidence regarding the development, review, and approval of the plan reflected in the 1987 written summary, even though the plan was the product of petitioner's own internal planning and closely resembled the 1986 plan.

Petitioner correctly points out that, as of the dates of the 1987 cross-chain sales, there was no contractual obligation between petitioner and GATX/BCE to consummate the sale of ML Capital Resources. We note, however, that petitioner had structured the "playing field" in order to expedite and simplify the sale of ML Capital Resources by (1) structuring the proposed sale as an auction designed to encourage the submission of bids acceptable to petitioner, (2) preparing and distributing a proposed Stock Purchase Agreement in conjunction with the 3-volume offering memorandum and advising prospective purchasers that petitioner "does not intend to engage in substantial negotiations" with respect to its terms, (3) securing at least one appraisal of residual value in anticipation of the sale, and (4) offering the prospective purchaser administrative resources

to facilitate the uninterrupted management of ML Capital Resources' lease portfolio after the sale closed.  In addition, on the date of the earliest 1987 cross-chain sale, petitioner had already had substantial contacts with prospective purchasers including GATX/BCE.  GATX/BCE had apparently already submitted a preliminary indication of interest (including a cash purchase price), and GATX/BCE had been selected by petitioner to perform detailed due diligence regarding the proposed sale.  Two days before Merrill Parent's board of directors approved the sale of ML Capital Resources and authorized appropriate officers to finalize the deal, GATX/BCE had submitted its formal bid to purchase ML Capital Resources' stock.  Merrill Parent had received and reviewed the bid prior to the board meeting and, in the written summary distributed at the meeting, described GATX/BCE to the board of directors as the "likely purchaser".

We reject petitioner's argument that any uncertainty regarding the terms of the proposed sale of ML Capital Resources at the time of the cross-chain sales prevents integration of the transactions for purposes of section 302(b).  A binding commitment or even an agreement in principle that each step of a plan will occur is not a prerequisite for finding that a firm and fixed plan existed, although uncertainty regarding one or more steps of the plan is a factor we must consider.  Roebling v. Commissioner, 77 T.C. at 55; Niedermeyer v. Commissioner, 62 T.C.

at 292. While there was some uncertainty regarding the details of the sale of ML Capital Resources on the dates of the cross-chain sales, there was no uncertainty that petitioner intended to sell ML Capital Resources as part of the plan. The totality of the facts and circumstances convinces us that petitioner had a firm and fixed plan to dispose of ML Capital Resources in a carefully orchestrated sequence of steps designed to avoid corporate-level tax on the transaction. The facts also convince us that petitioner was prepared to do everything reasonably possible to facilitate the implementation of that plan.

We find that a firm and fixed plan to dispose of ML Capital Resources outside the consolidated group existed on the dates of the cross-chain sales, and that the cross-chain sales, the distribution of a dividend of the gross sale proceeds, and the sale of ML Capital Resources were integrated steps in that plan.

### 3. The 1987 Cross-Chain Sale of Vessel Leasing

Because much of what was said regarding the other 1987 cross-chain sales applies with respect to the cross-chain sale of Vessel Leasing, we incorporate the foregoing analysis here. What differentiates the Vessel Leasing sale from the other 1987 cross-chain sales, however, is a chronology that makes it even easier to conclude that the Vessel Leasing sale must be integrated with the sale of ML Capital Resources outside the consolidated group.

The Vessel Leasing cross-chain sale closed on June 10, 1987. On that date, GATX/BCE had already submitted its initial and modified bids (April 21, 1987, and April 27, 1987, respectively) and had been "awarded the transaction", Merrill Parent's board of directors had met and authorized the consummation of the sale of ML Capital Resources' stock to GATX/BCE (April 24, 1987), GATX/BCE had entered into a nonbinding letter of intent (May 22, 1987), GATX's Finance Committee had approved the proposal to acquire ML Capital Resources' stock (June 1, 1987), and GATX/BCE had completed its due diligence review. During final negotiations, GATX had requested that ML Capital Resources dispose of its Vessel Leasing stock prior to closing because GATX/BCE could not own Vessel Leasing due to Federal law restrictions. Immediately thereafter the respective boards of ML Capital Resources and ML Asset Management approved the sale of Vessel Leasing's stock to ML Asset Management, and the final 1987 cross-chain sale closed.

It is apparent that the cross-chain sale of Vessel Leasing's stock to ML Asset Management was arranged in anticipation of the imminent sale of ML Capital Resources to GATX/BCE and was part of a seamless net of transactions culminating in the complete termination of ML Capital Resources' ownership interest in the issuing corporations, whose stock was sold cross-chain in transactions that qualified as section 304 redemptions. We find,

therefore, that a firm and fixed plan to dispose of ML Capital Resources outside the consolidated group existed on the date of the Vessel Leasing cross-chain sale and that the Vessel Leasing cross-chain sale, like the other 1987 cross-chain sales, was an integrated step in that plan.

Because the eight 1987 cross-chain sales (the deemed section 304 redemptions), when integrated with the sale of ML Capital Resources' stock, resulted in the complete termination of ML Capital Resources' actual and constructive ownership interest in the issuing corporations, see sec. 304(b), we hold that the redemptions qualified under section 302(b)(3) and that, therefore, the redemptions shall be treated as a payment in exchange for the stock under section 302(a) and not as a dividend under section 301.

IV. Conclusion

The record establishes that on the dates of the cross-chain sales, petitioner had agreed upon, and had begun to implement, a firm and fixed plan to completely terminate the target corporations' ownership interests in the issuing corporations (the subsidiaries whose stock was sold cross-chain). The plan was carefully structured to achieve very favorable tax basis adjustments resulting from the interplay of section 304 and the consolidated return regulations, and the steps of the plan were described in detail in written summaries prepared for meetings of

Merrill Parent's board of directors.  As described in those written summaries, the cross-chain sales of the issuing corporations' stock and the sales of the target corporations were part of the same seamless web of corporate activity intended by petitioner to culminate in the sale of the target corporations outside the consolidated group.  Under the test prescribed by this Court in <u>Niedermeyer v. Commissioner</u>, 62 T.C. 280 (1974), and other cases discussed herein, respondent properly integrated the cross-chain sales with the related sales of the target corporations to ascertain the tax consequences of the transactions, and we sustain respondent's determination.

We have considered the other arguments of the parties, and, to the extent not discussed herein, we conclude that the arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.